182 N.J. Super. 22 (1981)
440 A.2d 21
EDWARD JALOWIECKI AND SHARON JALOWIECKI, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
HUGO LEUC AND DOROTHY LEUC, HIS WIFE, DEFENDANTS AND THIRD-PARTY PLAINTIFFS-RESPONDENTS,
v.
BERMUDA POOL CO. AND MONARCH POOL CO., INC., THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Submitted October 27, 1981.
Decided December 9, 1981.
*23 Before Judges MICHELS, McELROY and J.H. COLEMAN.
Solomon & Ramer for appellants (Paul D. Solomon of counsel and on the brief).
Barry N. Chase for respondents.
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiffs Edward Jalowiecki and Sharon Jalowiecki appeal from a judgment of the Law Division in favor of defendants Hugo Leuc and Dorothy Leuc, dismissing with prejudice plaintiffs' action to recover damages allegedly sustained when the septic system located on the property they purchased from defendants malfunctioned. Plaintiffs' action is based upon (1) an alleged violation of the "Standards for Construction of Individual *24 Subsurface Sewage Disposal Systems" (N.J.A.C. 7:9-2.1 et seq.), promulgated by the Commissioner of Environmental Protection pursuant to the authority conferred by The Realty Improvement Sewerage and Facilities Act (1954), N.J.S.A. 58:11-23 et seq. (L. 1954, c. 199, § 1 et seq.), and (2) an alleged knowing and intentional misrepresentation and concealment of material facts concerning the condition and functioning of the septic system.
The proofs at trial show that on August 4, 1977 plaintiffs purchased a one-family house in Highland Lakes, New Jersey, from defendants. In May 1977, prior to purchasing the house, plaintiffs visited the property on several occasions and on May 31, 1977 signed a contract to purchase. From their first visit to the house until the closing of title on August 4, 1977 plaintiffs were furnished information about the house and property in response to their various questions. In addition, plaintiffs were permitted to conduct whatever inspections of the house and property they chose. During the summer of 1977 plaintiffs visited the house several times to take measurements, get instructions on how the outdoor pool operated and, on one occasion, just to pay a social call. Plaintiffs never noticed any indication of a problem with the septic system or with flooding in the basement or backyard during any of their visits to the property. Plaintiff Edward Jalowiecki testified that he inspected the entire property, including the basement of the house, and was convinced that the basement was dry and had not had water in it. He also testified that he was satisfied that "[t]here was no evidence of any water leaking or any water problem" and that "[t]he house was soundly constructed and was dry." Plaintiffs testified that prior to closing they never felt that defendants were trying to hide or withhold anything from them. Defendant Hugo Leuc also indicated to plaintiffs where he believed the septic tank was located and gave them the original permit for the septic system, which contained a sketch of the system's layout and location.
*25 On August 4, 1977 plaintiffs closed title and took possession. Ten days later plaintiffs began to experience problems with the septic system. The system backed up, causing the toilet and drainpipe in the ground level basement to overflow. In the early part of September plaintiffs called defendants to ask if they had ever had any problems with the septic system, to which defendants responded in the negative. Since plaintiffs were still unsure of the source of the problem, they fixed the seal on the basement toilet and capped the drainpipe. Although these measures alleviated the water in the house, the ground in the backyard in the area of the septic system began to be constantly wet. Water apparently was seeping up through the ground. At that time, however, plaintiffs thought that water might be coming from a leak in the above-ground pool located over one of the two seepage tanks which constituted the drainage area for the septic system. The location of the pool over that portion of the septic system drainage area violated N.J.A.C. 7:9-2.22 of the "Standards for Construction of Individual Subsurface Sewage Disposal Systems."
By late November 1977 the backyard was so wet that plaintiffs arranged to have the septic tank pumped out. This, however, did not cure the problem, and the backyard remained wet the entire winter. In the spring of 1978 plaintiffs drained the pool and patched several leaks. Thereafter, one of the pool's sides caved in when they attempted to refill it. By the time the pool was repaired, plaintiffs claimed that the backyard could not be used because the water on the ground was beginning to smell. They retained an engineering company to inspect the septic system and again arranged to have the tank pumped out. After various tests were run it was determined that a new disposal area for the septic system was needed, requiring the removal of the pool. Subsequently the pool was removed and sold, and a new disposal area, consisting of four leach pipes was connected to the existing septic tank. This finally remedied the problem.
*26 Defendants testified that they never experienced any malfunctioning of the drainage system in the house; that the system was never in need of repairs, and that there was no septic odor in the house. Furthermore, they stated that from 1971 until 1977  the time they owned the house  they never noticed any surface water in the backyard, or detected any unusual odor, nor did they ever have a problem with the basement toilet and drainpipe or the septic system in general. They also testified that they had answered all of plaintiffs' questions to the best of their knowledge in an attempt to educate the buyers about the house. This included giving plaintiffs instructions on several occasions as to the way to care for the pool and turning over papers pertaining to the appliances in the house and the septic system in the backyard.
At the end of the presentation of plaintiffs' evidence the trial judge, ostensibly concluding that plaintiffs had an implied private cause of action for damages based on a violation of N.J.A.C. 7:9-2.22, nonetheless held that they had failed to prove that the violation proximately caused the malfunctioning of the septic system and resultant damage. At the close of all of the evidence the judge found that while the septic system was faulty, defendants did not knowingly and intentionally misrepresent or conceal its condition. Judgment was thereafter entered in favor of defendants, and this appeal followed.

Sufficiency of the Evidence
The principal thrust of plaintiffs' challenge to the adverse judgment entered with respect to the cause of action based upon misrepresentation and concealment is that it is contrary to the weight of the evidence. We disagree. We have studied the entire record in light of the contentions raised by plaintiffs and are entirely satisfied that the findings and conclusions of the trial judge are amply supported by the evidence, and we discern no good reason for disturbing them. Leimgruber v. Claridge Assoc., Ltd., 73 N.J. 450, 455-456 (1977); Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974); State v. *27 Johnson, 42 N.J. 146, 161-162 (1964). We simply add that plaintiffs' reliance upon Weintraub v. Krobatsch, 64 N.J. 445 (1974), is misplaced because here the trial judge specifically found that defendants did not knowingly and intentionally misrepresent or conceal information of a significant nature concerning the condition and operation of the septic system.

Plaintiffs Right to Maintain A Private Cause of Action for Damages Under N.J.A.C. 7:9-2.22
Plaintiffs also contend that they are entitled to a judgment for damages under N.J.A.C. 7:9-2.22. While not fully or clearly articulated, the issue raised by this contention is whether the regulation creates a private cause of action for damages in favor of plaintiffs.
The regulation, N.J.A.C. 7:9-2.22, which is contained in the "Standards For Construction of Individual Surface Sewage Disposal Systems" (N.J.A.C. 7:9-2.1 et seq.), provides:
The area to be used for sewage disposal shall be selected and maintained so that it is free from encroachments by driveways, accessory buildings, additions to the main building and trees or shrubbery whose roots may cause clogging of any part of the system. The area of sewage disposal shall not be located under driveways, parking lots (paved or otherwise), accessory buildings, additions to main buildings and so forth. [N.J.A.C. 7:9-2.22]
These standards constitute the rules of the Division of Water Resources and govern the design and installation of individual subsurface sewage disposal systems. N.J.A.C. 7:9-2.1. They were promulgated by the Commissioner of Environmental Protection (formerly the State Commissioner of Health) pursuant to N.J.S.A. 58:11-36 of the Realty Improvement Sewerage and Facilities Act (1954) (the act) which provides the statutory basis for regulating the effect of certain realty improvements, including individual sewerage facilities, upon the public health. N.J.S.A. 58:11-23 et seq. The standards which have been promulgated constitute the minimum requirements to be met by applicants for certifications under the act. N.J.S.A. 58:11-36. If these standards are not met and the proper application and certification not filed and received, a violator will be subject to *28 penalties. N.J.S.A. 58:11-38. For noncompliance a violator may be fined for each offense or enjoined from further violations. See N.J.S.A. 58:11-39 to N.J.S.A. 58:11-41.
Here the proofs show that in 1972 defendants installed an above-ground swimming pool over one of the seepage tanks constituting the disposal area of the septic system. The installation of the swimming pool in such manner violated the provisions of N.J.A.C. 7:9-2.22 and subjected defendants to the penalties and injunctive relief provided by the Act. See N.J.S.A. 58:11-39 to N.J.S.A. 58:11-41. These remedies and enforcement procedures were available to the public officials charged with enforcing these regulations. However, neither the act nor the regulations promulgated thereunder expressly provide for a private civil remedy or grant to an injured party the right to maintain a private cause of action for damages. Thus, for plaintiff to maintain an action for damages under N.J.A.C. 7:9-2.22, such a private cause of action would have to be implied from the statutory scheme involved or the administrative regulations promulgated thereunder. In our view a private civil remedy or private cause of action for damages may not be implied from either. Our holding in this regard is consistent with the long-standing rule discussed by the Supreme Court in Osback v. Lyndhurst Tp., 7 N.J. 371 (1951). There a town employee in the course of his duties injured a bystander, who then sued the municipality. Plaintiff prevailed in its suit but found that the town had not obtained the statutorily required liability insurance to satisfy his claim. Plaintiff then sued the city to recover the amount that he would have received from the insurance company if the town had had a policy in accordance with the statutory mandate. The Supreme Court rejected plaintiff's argument that one detrimentally effected by the noncompliance with the statute has a cause of action for the injury or loss thus sustained. In reaffirming this rule, the court stated:
We are cognizant of the individual hardship which may occasionally befall an employee as a result of a municipality's default in obeying the legislative command. The statute, however, while stating the requirement of public *29 liability insurance in mandatory language, does not provide a remedy for those who may suffer through a failure to comply with its terms. If it had done so, the right to recover would be clear.
Under somewhat similar circumstances, in Strohmeyer v. Little Ferry, 136 N.J.L. 485 (E. & A. 1947) it was said:
"Had the legislature also provided for recovery where a police officer was illegally suspended, the appellant's right to recovery in this case would have been clear; but since no such right has been granted we are obliged to find that the ruling of the learned trial judge in striking the complaint was in all respects proper."
Since no right of action by the appellant against the township existed prior to the statute, and since no such right was specifically created by it, in our opinion the complaint must fall.
We can see no general evil results from, or greatly unbalanced equities arising out of, a continuation of what seems a well fortified rule, nor is there a cogent reason why the previous apparently wise adjudications on this subject should be departed from. [7 N.J. at 376]
See, also, Gold Fuel Service, Inc. v. Esso Standard Oil Co., 59 N.J. Super. 6, 18 (Ch. Div. 1959), aff'd on jurisdictional grounds only, 32 N.J. 459 (1960), cert. den. 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). Cf. Houdaille Constr. Materials v. Amer. Tel. & Tel. Co., 166 N.J. Super. 172, 187-188 (Law Div. 1979).
Even if this rigid rule discussed and reaffirmed in Osback v. Lyndhurst Tp., has given way over the past 30 years to the more modern view that a private cause of action for violation of administrative regulations may be implied in an appropriate case (see Blue Chip Stamp v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (discussing the correctness of Kardon v. National Gypsum Co., 69 F. Supp. 512 (E.D.Pa. 1946) (the first case to imply a private cause of action under Securities and Exchange Commission Rule 10b-5)), nevertheless we hold that plaintiffs could not maintain a private cause of action for damages under the regulation here involved. The test for determining when a private cause of action may be implied was set forth at length in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). There the United States Supreme Court examined the viability of an implied private damage action against an individual who had violated a federal criminal statute regulating political contributions. In rejecting the assertion *30 that such a private cause of action could be implied, the court discussed the four factors that should be considered, explaining:
In determining whether a private remedy is implicit in a statute not expressly providing one several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted," Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39, 60 L.Ed. 874, 36 S.Ct. 482 [484] (1916) (emphasis supplied)  that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, e.g. National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453, 458, 460, 38 L.Ed.2d 646, 94 S.Ct. 690 [693, 694] (1974) (Amtrak). Third, is it consistent with the underlying purposes of the legislative scheme to imply such remedy for the plaintiff? See, e.g. Amtrak supra; Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 423, 44 L.Ed.2d 263, 95 S.Ct. 1733 [1740] (1975); Calhoon v. Harvey, 379 U.S. 134, 13 L.Ed.2d 190, 85 S.Ct. 292 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See Wheeldin v. Wheeler, 373 U.S. 647, 652, 10 L.Ed.2d 605, 83 S.Ct. 1441 [1445] (1963); cf. J.I. Case Co. v. Borak, 377 U.S. 426, 434, 12 L.Ed.2d 423, 84 S.Ct. 1555 [1560] (1964); Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 394-395, 29 L.Ed.2d 619, 91 S.Ct. 1999 [2003-2004] (1971); id. at 400, 29 L.Ed.2d 619, 91 S.Ct. 1999 (Harlan, J., concurring in judgment). [422 U.S. at 78-79, 95 S.Ct. at 2087-2088, 45 L.Ed.2d at 36-37]
Subsequent cases have highlighted the various factors listed in Cort v. Ash to differing extents, but the primary goal has almost invariably been a search for the underlying legislative intent. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). But see Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Congress' failure to consider a private remedy does not preclude an implied cause of action). Recently, in Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court had before it an alleged private cause of action based upon the Federal Water Pollution Control Act and the Marine Protection Research and Sanctuaries Act of 1972. Noting that the federal pollution statutes contained a comprehensive scheme of remedies provided by Congress, the Supreme Court cautioned:

*31 As we stated in Transamerica Mortgage Advisors, supra, "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." 444 U.S. at 19, 62 L.Ed.2d 146, 100 S.Ct. 242 [247]. See also Touche Ross & Co. v. Redington, supra, 442 U.S. at 571-574, 61 L.Ed.2d 82, 99 S.Ct. 2479 [2486-2488]. In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate. [453 U.S. at 14-15, 101 S.Ct. at 2623, 69 L.Ed.2d at 447]
With these guidelines in mind, the administrative regulation violated by defendants in this case must be examined to see if it would be appropriate to imply a private cause of action for damages in favor of plaintiffs. The first factor  were plaintiffs part of the particular "class for whose especial benefit the statute was enacted"  is not satisfied. The statutory and regulatory scheme here is an effort to preserve the public health, the potable water supply, and the environment in general for the community as a whole, not for any specific person or group of people who might be affected by improper sewerage disposal. In the enabling legislation creating the Department of Environmental Protection (Department), which is charged with enforcing these provisions, it is stated, in part, that:
The department shall formulate comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State. The department shall in addition to the powers and the duties vested in it by this act or by any other law have the power to:
........
e. Receive or initiate complaints of pollution of the environment, including thermal pollution, hold hearings in connection therewith and institute legal proceedings for the prevention of pollution of the environment and abatement of nuisances in connection therewith and shall have the authority to seek and obtain injunctive relief and the recovery of fines and penalties in summary proceedings in the Superior Court;
........
n. Enforce the State air pollution, water pollution, conservation, environmental protection, waste and refuse disposal laws, rules and regulations;
........
[N.J.S.A. 13:1D-9]
Thus, it would appear that the legislative intent of the statutory schemes which the Department is charged with enforcing is *32 to protect the environment for the public as a whole, not for any single person or group of people. See N.J.S.A. 13:1D-7 (charging the Department of Environmental Protection with, among, other things, enforcement of the act).
As to the second factor  is there indication of an intent to create or deny such a private cause of action  there is no explicit indicator of such an intent by our Legislature. As noted earlier, however, the public body charged with enforcing this act may, in a summary proceeding, impose fines, order a stoppage of all further work on a violating improvement, or seek an injunction against future violations. N.J.S.A. 58:11-39 to 41. The purpose of providing such broad remedies and enforcement procedures would seem to be to allow the Department a variety of tools to force rapid compliance with the standards promulgated pursuant to the Act. In that way the legislative goal of protecting the public health and environment may be expeditiously effectuated.
Furthermore, the only legislative history dealing with the act or any of its amendments supports the view that our Legislature was primarily concerned with expedited agency enforcement of the act and the regulations issued thereunder, rather than with providing a private remedy. In the Statement attached to the 1971 amendments to the act, it was noted that
These amendments to "The Realty Improvements, Sewerage and Facilities Act (1954)" are designed to insure that where a substantial development is proposed the water supply and sewerage facilities to be constructed will comply with the standards promulgated pursuant to this Act. The amendment provides that no subdivision approval may be granted to cover 50 or more realty improvements until state certification has first been obtained. Enforcement of the act will also be expedited by authorized injunction by summary proceedings. [L. 1971, c. 386, Sponsor's Statement]
The third factor  is an implied private action consistent with the purposes of the legislation  may be viewed in a similar fashion. Although a private action might help to deter violations of the act, such protracted civil litigation could not possibly be as effective in promoting environmental protection as the summary proceedings available to the Department. Therefore, while consistent with the spirit of the act, such a private action *33 would be superfluous to the achievement of the legislation's purpose.
The last factor  is the action one traditionally relegated to state law  is not applicable to a state statute or administrative regulation promulgated thereunder. This final element of the Cort test "derives from the basic principle of federalism which accords deference to the states in those areas of the law customarily regulated by them, [citations omitted] and is founded on a recognition that Congress would not intend to create by implication a private cause of action which would constitute a new federal right in an area of the law traditionally regulated by the states." Hurley v. Allied Chemical Corp., W. Va., 262 S.E.2d 757, 760-761 (Sup.Ct. 1980).
Considered in light of the Cort test, we are compelled to conclude that our Legislature provided precisely the remedies it considered appropriate for the enforcement of the "Standards for Construction of Individual Subsurface Sewage Disposal Systems," including N.J.A.C. 7:9-2.22, and that it did not intend to authorize by implication a private cause of action for damages or other civil remedy in favor of a party injured by a failure to comply with those standards.
Accordingly, the judgment under review is affirmed.