**COOPER DEVELOPMENT COMPANY, INC., Plaintiff,**

v.

**FIRST NATIONAL BANK OF BOSTON, as Trustee of the Cooper Laboratories, Inc., Stockholders Liquidating Trust, Defendant.**

Civ. A. No. 90–2678.

United States District Court,
D. New Jersey.

April 25, 1991.

John Agnello, Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, Roseland, N.J., and Richard E. Wallace, John G. Bickerman, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for plaintiff.

Michael L. Rodburg, Stephen H. Skoller, David A. Thomas, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for defendant.

## OPINION

WOLIN, District Judge.

In this case, the Court must decide the scope of application of the New Jersey Environmental Cleanup and Responsibility Act ("ECRA") to a corporate transaction involving a parent corporation and its subsidiary. Before the Court are defendant's motion to dismiss this suit pursuant to Federal Rule 12(b)(6) and plaintiff's cross-motion for partial summary judgment pursuant to Federal Rule 56. For the reasons expressed below, the Court will deny defendant's motion to dismiss. Because the Court finds that defendant is liable for a share of plaintiff's cleanup costs, it will grant, in part, plaintiff's motion for partial summary judgment.

## I. BACKGROUND

In September 1982, Cooper Laboratories ("Laboratories"), for which the defendant First National Bank of Boston ("First National") is acting as trustee, incorporated Cooper Development ("Cooper") as its wholly-owned subsidiary.[1] On November 1, 1983, Laboratories acquired the Freehold Facility,[2] a manufacturing facility which produces biomedical products, and transferred it to Cooper on the same day. Laboratories provided administrative and managerial services to Cooper, including tax, treasury, legal, risk management, investor relations, corporate development, financial reporting and data processing. Cooper began publicly trading its stock in 1983, although Laboratories remained an 85 percent shareholder.

On June 17, 1985, in accordance with a liquidation plan, Laboratories transferred its controlling interest in Cooper, about 85 percent of the shares of Cooper, to Laboratories shareholders. Laboratories simultaneously filed a Certificate of Dissolution with the state of Delaware. Pursuant to its Plan of Liquidation, Laboratories entered into the Cooper Laboratories, Inc. Stockholders' Liquidating Trust Agreement dated June 21, 1985 with defendant First National. In the Trust Agreement, Laboratories transferred to First National, as trustee, all of its liabilities and obligations, as well as certain assets[3] which had not been distributed to its stockholders or disbursed to creditors. Neither Laboratories nor Cooper complied with ECRA's notice and reporting requirements in executing this transaction.

In 1986, Cooper sought to sell the Freehold Facility. As required by ECRA, Cooper filed a notice with the New Jersey Department of Environmental Protection (NJDEP) in connection with the proposed transfer of the facility. NJDEP required that Cooper investigate the contamination at the Freehold Facility, propose a cleanup plan that was subject to state approval and undertake cleanup in accordance with the approved plan. In its investigation, Cooper found that production processes had caused groundwater and other contamination at the Freehold Facility. The costs of the cleanup have already exceeded one million dollars and Cooper estimates that on-going cleanup activities will cost several million dollars.

On July 5, 1990, NJDEP sent Laboratories a letter informing the company that its dissolution in 1985 was conducted in violation of ECRA and requesting that the company submit portions of ECRA Initial Notice forms. Barbara Murray, Chief of NJDEP's Bureau of ECRA Applicability and Compliance, confirmed in an affidavit that the July 5 letter accurately reflects NJDEP's position. Counsel for First National, as Laboratories' trustee, responded to NJDEP's letter in December 1990 and claimed that Cooper was solely responsible for the non-compliance. To date, NJDEP has taken no further action on this matter.

## II. DISCUSSION

This case presents issues of first impression. Few courts have interpreted ECRA and it has meager legislative history.[4] The primary issues implicated in these motions are: (1) ECRA's application to Laboratories' dissolution and stock distribution in 1985, (2) Laboratories' or Cooper's respon-

---

1. Cooper Development was previously named Cooper–Biomedical until April 1986.

2. Both plaintiff and defendant agree that the Freehold Facility is an "industrial establishment" within the meaning of ECRA.

3. Section 1.2 of the Trust Agreement states:
   Cooper [Labs] transfers and assigns to the Trustee, for satisfaction out of the Trust Property, all of its obligations and liabilities of any kind and nature, whether liquidated or unliquidated, known or unknown, contingent or fixed (collectively 'Trust Obligations'), and the

Trustee in its capacity as Trustee assumes, and agrees to pay, Trust Obligations out of the Trust Property, except to the extent the same shall be contested in good faith and by appropriate proceedings and except to the extent that Cooper and/or the Trustee are indemnified against Trust Obligations by third parties.

4. For a comprehensive discussion of ECRA's minimal legislative history, *see* Note, *The Environmental Cleanup Responsibility Act (ECRA): New Accountability for Industrial Landowners in New Jersey,* 8 Seton Hall Legisl.J. 331 (1984).

sibility for complying with ECRA, and (3) Cooper's ability to recover damages from Laboratories in a private cause of action under ECRA.

## A. Procedural Standards

### (1) *Motion to Dismiss*

In determining whether a complaint should be dismissed for failure to state a claim pursuant to 12(b)(6), the Court must limit its consideration to the facts alleged in the complaint. *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978). Moreover, in its examination of the complaint, the Court is required to accept all of the allegations contained therein and all inferences arising therefrom as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Unless plaintiff can prove no set of facts in support of its claim that would entitle it to relief, its complaint should not be dismissed. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *D.P. Enterprises v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984).

### (2) *Standard for Summary Judgment*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact, and once the moving party has sustained this burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 464 (3d Cir.1989).

A genuine issue is not established unless the evidence, viewed in a light most favorable to the nonmoving party, would allow a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir.1989).

If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Radich*, 886 F.2d at 1395. Whether a fact is material is determined by substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989).

## B. Description of ECRA

Enacted in 1983,[5] ECRA represented the New Jersey Legislature's response to the problem of abandoned hazardous waste sites. *New Jersey Department of Environmental Protection v. Ventron*, 94 N.J. 473, 468 A.2d 150 (1983), a suit brought by NJDEP against the current owners of a decaying chemical plant and their predecessors in interest, illustrated the difficulties that governmental agencies experienced in cleaning up abandoned facilities. NJDEP was compelled to engage in expensive and time-consuming litigation to remedy the environmental damage at the plant. In similar situations, state and federal agencies were forced to initiate comprehensive cleanup efforts and legal actions against previous owners. ECRA's sponsor, State Senator Raymond Lesniak, explained that contaminated property "leav[es] a blight on our State and health hazards and economic burdens to our residents." *See* Lesniak, *ECRA is Coming*, 104 N.J.Law. 41 (1983). ECRA was passed in response to *Ventron*-type problems at hazardous industrial facilities.

ECRA's primary purpose is to impose liability for cleanup costs on property owners without protracted litigation. As courts have recognized, "[t]he essential goal of ECRA is to secure the cleanup of contaminated industrial sites at the earliest possible date." *Dixon Venture v. J. Dixon Crucible*, 235 N.J.Super. 105, 111, 561 A.2d 663 (App.Div.1989), *aff'd as modified*, 122 N.J. 228, 584 A.2d 797 (1991). This motive is expressed in the legislature's finding that

the generation, handling, storage and disposal of hazardous substances and

---

5. The statute became effective on December 31, 1983.

wastes pose an inherent danger of exposing citizens, property and natural resources of this State to substantial risk of harm or degradation; that the closing of operations and the transfer of real property utilized for the ... hazardous substances and wastes should be conducted in a rational and orderly way, so as to minimize potential risks; and that it is necessary to impose a precondition on any closure or transfer of these operations by requiring the adequate preparation and implementation of acceptable cleanup procedures. . . .

N.J.Stat.Ann. § 13:1K–7. As the court observed in *Superior Air Products v. NL Indus.*, 216 N.J.Super. 46, 522 A.2d 1025 (App.Div.1987), ECRA imposes "a self-executing duty to remediate without the necessity and delay" of a determination of liability through litigation. *Id.* at 63, 522 A.2d 1025.

ECRA requires all "industrial establishments"[6] to obtain prior NJDEP approval of either a negative declaration that the site is free from possible contamination or a cleanup plan as a precondition to the sale, closure or transfer of business operations. N.J.Stat.Ann. § 13:1K–9. Any "owner or operator" of an industrial establishment planning to sell or close operations must notify NJDEP within five days after public release of its decision to close or within five days of the execution of any agreement of sale or option to buy, as applicable. N.J. Stat.Ann. § 13:1K–9. The NJDEP regulations describe the type of information to be submitted, including inventories of hazardous substances, description of current operations, copies of all soil, groundwater and surface water sampling results and details of the impending transaction. N.J.Admin. Code § 7:1–3.7(d).

After conducting a preliminary site inspection of all industrial establishments which have notified the Department, NJDEP issues a preliminary report describing site conditions and providing guidance for ECRA compliance. The Department supplements all initial notice submissions with its own review of available records of relevant federal, state, county and municipal agencies. Following approval and implementation of an appropriate sampling plan, the owner or operator of the establishment must submit either a cleanup plan or a negative declaration. All cleanup plans must be accompanied by financial security, guaranteeing the performance of the cleanup plan, in an amount equal to the cost estimate approved by NJDEP for the plan's implementation. N.J.Stat.Ann. § 13:1K–9(a)(2) and (b)(3).

ECRA provides stringent penalties for failure to comply with the Act or regulations. Failure to comply allows NJDEP or the transferee to void the sale or transfer of the industrial establishment or real property. N.J.Stat.Ann. § 13:1K–13(a) and (b). The transferee is also entitled to recover damages due to the voiding of the transaction and the transferor is held to be strictly liable for all cleanup and removal costs. § 13:1K–13(a). In addition, NJDEP may seek penalties of a maximum of $25,000 per day from any person giving false information or otherwise failing to comply with ECRA. § 13:1K–13(c). Any corporate officer who knowingly directs or authorizes violations of the Act will be personally liable for ECRA penalties. § 13:1K–13(c).

ECRA serves as a major incentive for businesses to plan and conduct environmentally safe industrial operations. In its six years of existence, ECRA has been respon-

6. An "industrial establishment" is defined as: any place of business engaged in operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances or wastes on-site, above or below ground, having a [specified] Standard Industrial Classification number.
N.J.Stat.Ann. § 13:1K–9. A Standard Industrial Classification (SIC) number is assigned by the federal Office of Management and Budget and describes the type of operation. For example, number 22 refers to textile mill products and number 23 refers to apparel and similar materials. ECRA initially included SIC designation codes covering a wide range of businesses. In 1986, pursuant to its authority under the statute, NJDEP adopted exemptions for several SIC codes originally included in ECRA.

sible for more than two hundred million dollars in privately funded cleanups.[7]

ECRA is the first state law which imposes wide-ranging liability on owners and operators of commercial and industrial real estate prior to transfer or closing of business operations. As the New Jersey Supreme Court has noted,

> ECRA is quite unlike other environmental regimes in that it uses market forces to bring about the reversal of environmental pollution. It recognizes that some environmental conditions not posing an imminent hazard to air or water resources of the state may safely attend economic activities.

*Dixon Venture v. Joseph Dixon Crucible Co.*, 122 N.J. 228, 236–37, 584 A.2d 797 (1991) (per curiam). Inspired by ECRA, Connecticut, Iowa, Missouri and Illinois have passed similar statutes. State legislatures in New York, Pennsylvania and Massachusetts have considered ECRA-type legislation.[8]

## C. Applicability of ECRA to Laboratories' Stock Distribution

■ Section 13:1K–9 of ECRA states that the "owner or operator of an industrial establishment" planning to "close … sell or transfer operations" must notify NJDEP and submit a negative declaration or cleanup plan subject to NJDEP approval. Section 13:1K–8 defines "[c]losing, terminating or transferring operations" as

> the cessation of all operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances and wastes, or any temporary cessation for a period of not less than

two years, or any other transaction or proceeding through which an industrial establishment becomes nonoperational for health or safety reasons or undergoes change in ownership, except for corporate reorganization not substantially affecting the ownership of the industrial establishment, including but not limited to sale of stock in the form of a statutory merger or consolidation, sale of the controlling share of the assets, the conveyance of the real property, dissolution of corporate identity, financial reorganization and initiation of bankruptcy proceedings[.][9]

Cooper argues that Section 13:1K–9 mandated that Laboratories comply with ECRA's notice and cleanup requirements in connection with its 1985 liquidation and distribution of stock.

However, Laboratories claims that its 1985 transaction did not trigger ECRA because it did not involve the closure, termination or transfer of operations at the Freehold Facility. Laboratories asserts that the distribution of 85 percent of Cooper's stock did not affect Cooper's ownership of the Freehold Facility.

### (1) *Principles of Statutory Construction*

Section 13:1K–9 is ambiguous, even when the definition of "closing, terminating or transferring operations" is considered. Because this case requires the Court to construe a new statute, it will review some well-settled principles of statutory interpretation. The starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as con-

---

7. *See* Motiuk & Sheridan, *New Jersey's ECRA: Problems, Policies, Future Trends,* 21 Env't Rep. (BNA) No. 13, at 549 (July 27, 1990). "Already some 370 sites have been cleaned up or investigated under the program, and companies have agreed to provide $475 million to clean up another 480 sites in coming years." Barrett, *New Jersey, After Federal Leadership Waned, Has Become Environmental Protection Pioneer,* Wall St. J., July 5, 1988, p. 44, col. 4.

8. *See* Motiuk & Sheridan, *New Jersey's ECRA: Problems, Policies, Future Trends,* 21 Env't Rep. (BNA) No. 13, at 549 (July 27, 1990).

9. According to one commentary, this provision has been the subject of more debate than perhaps any other portion of the ECRA statute. Motiuk & Sheridan, *New Jersey's ECRA: Problems, Policies, Future Trends,* 21 Env't Rep. No. 13, at 549 (BNA) (July 27, 1990). Another author described the definition of transactions that trigger ECRA as "the most problematic area of ECRA implementation." Schmidt, *New Jersey's Experience Implementing the Environmental Cleanup Responsibility Act,* 38 Rutgers L.Rev. 729, 743 (1986).

clusive. *Consumer Products Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). If the statutory language is clear, a court must give it effect unless the legislative history is such that a literal reading "will produce a result demonstrably at odds with the intention of [the] drafters," *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3251, 73 L.Ed.2d 973 (1982), or "would thwart the obvious purposes of the ... statute." *Mansell v. Mansell,* 490 U.S. 581, 109 S.Ct. 2023, 2030, 104 L.Ed.2d 675 (1989).

When a statute's meaning is unclear, a court will look to other sources, such as the law's legislative history, administrative regulations promulgated by the agency charged with enforcement, and policy considerations, to interpret the statute's meaning in light of the legislature's intent. Unfortunately, only minimal legislative history exists for ECRA, consisting primarily of a legislative committee statement, and nothing in the history discusses the interpretation of the "closing, terminating or transferring operations" provision.

■ Another well-established principle is that where statutory language and legislative history do not speak directly to the issue before the Court, the Court must uphold a construction of the statute rendered by the agency entrusted with interpreting it. As explained by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984),

> If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82. If an agency's construction is reasonable, a court must defer to it even though it may not be the only interpretation or even the most reasonable one. *Smith v. Fidelity Discount Consumer Co.,* 898 F.2d 907 (3d Cir.1990); *Kean v. Heckler,* 799 F.2d 895, 899 (3d Cir.1986). All that is required to sustain an agency's interpretation is that it is "sufficiently rational [so as] to preclude a court from substituting its judgment for that of the agency." *Chemical Mfrs. Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985).

This administrative law doctrine is usually applied to Congressional statutes administered by federal agencies. The Third Circuit has held that it also applies to a "state statute that serves as a federal agency's rule of decision, if the issue ... falls squarely within the federal agency's field of expertise and the state courts or state agency charged with administering the state statute have not ruled out the interpretation ... proffered by the federal agency." *Montgomery Nat'l Bank v. Clarke,* 882 F.2d 87, 92 (3d Cir.1989).

■ The Court believes that it should give similar deference to the construction of a state statute by the state agency charged with enforcing it. New Jersey courts have followed this approach and given "great weight" to statutory interpretations by New Jersey agencies. *New Jersey Guild of Hearing Aid Dispensors v. Long,* 75 N.J. 544, 575, 384 A.2d 795 (1978). While an administrative regulation must be within the fair contemplation of the delegation in the enabling statute, the legislative grant "is to be liberally construed to enable the agency to accomplish its statutory responsibilities." *In the Matter of Freshwater Wetlands,* 238 N.J.Super. 516, 526, 570 A.2d 435 (App.Div.1989); *Long,* 75 N.J. at 562, 384 A.2d 795. New Jersey courts have also relied on NJDEP's regulations to interpret the meaning of "cessation of all operations" under ECRA. *In the Matter of Fabritex Mills,* 231 N.J.Super. 224, 555 A.2d 649 (App.Div.1989) (statutory phrase means "cessation of substantially all operations" as interpreted in most recent NJDEP regulations).

■ The Court notes that deference to administrative regulations is especially ap-

propriate in this case, since ECRA is a relatively new statute that has received only minimal judicial interpretation. Courts have recognized that deference to agency interpretation is heightened when the case involves construction of a new statute by its implementing agency. *Long,* 75 N.J. at 575, 384 A.2d 795; *Freshwater Wetlands,* 238 N.J.Super. at 527, 570 A.2d 435; *Atlantic Richfield Co. v. United States Dept. of Energy,* 769 F.2d 771, 790 (D.C.Cir.1984); *Natural Resources Defense Council v. Train,* 510 F.2d 692, 706 (D.C.Cir.1975).

(2) *Application of NJDEP Regulations* [10]

The current NJDEP regulations implementing ECRA, promulgated in 1987 and amended in 1989, state that

> closing, termination or transferring operations' means any one of the following:
>
> \* \* \* \* \* \*
>
> 5. Except for any corporate organization not substantially affecting ownership, any change in ownership of the industrial establishment including, but not limited to, transfer by any means of shares of a corporation which results in the a change in the controlling interest in the owner or operator ...

N.J.Admin.Code § 7:26B–1.3. "Controlling interest" is defined as more than 50 percent of the stock of a corporation. N.J.Admin.Code § 7:26B–1.3. In the "Applicability" section of the regulations,

> closing, terminating or transferring operations includes, but is not limited to, the following events:
>
> \* \* \* \* \* \*
>
> 2. Sale or transfer of stock in a corporation which results in a change in the person or persons holding the controlling interest of a corporation which directly or indirectly owns or operates, or *indirectly through any of its subsidiaries,* owns or operates an industrial establish-

ment, unless the Department determines otherwise ...

> \* \* \* \* \* \*
>
> 6. Dissolution of a corporation which directly owns or operates, or *indirectly through any of its subsidiaries* owns or operates an industrial establishment, unless the Department determines otherwise ...

N.J.Admin.Code § 7:26B–1.5 (emphasis added). NJDEP has also indicated in its published responses to comments on the regulations that ECRA applies to the transfer of a controlling interest in a parent company that owns or operates a facility and to the dissolution of a parent company whose subsidiary owns or operates an industrial establishment. *See* 19 N.J.Reg. 2439, 2442 (Dec. 21, 1987); 21 N.J.Reg. 2374 at ¶ 64 (Aug. 7, 1989).

NJDEP's regulation implementing ECRA's "closing, sale or transfer" provision is a reasonable interpretation of the statute and therefore, the Court must defer to NJDEP's construction. NJDEP's letter of violation issued to Laboratories further supports the application of the statute to this transaction. Under NJDEP's interpretation of this provision in its regulations, Laboratories dissolution and transfer of stock in 1985 would trigger ECRA. First, the 1985 transaction appears to satisfy the definition of "closing, terminating or transferring operations," as a "transfer by any means of shares of a corporation which results in a change in the controlling interest in the owner or operator." N.J.Admin. Code § 7:26B–1.3. Given that Cooper is an owner of Freehold Facility, the 1985 transaction dissolved Laboratories' 85 percent interest in Cooper. In this way, the controlling interest (greater than 50% of the outstanding shares) in Cooper was changed from Laboratories, as an 85% owner, to Cooper, as an independent corporation.

Second, the 1985 transaction fits the description in numbers two and six of the

**10.** The Court notes that a proposed amendment to ECRA incorporates much of the NJDEP regulations, including those interpreting the "closing, sale or transfer" provision, into the statute. *See* N.J. Assembly Bill No. 122 (1990 Session).

The amendment, sponsored by New Jersey Assemblyman Albohn, was not enacted in 1988, and was reintroduced in 1990. No action has yet been taken on the proposed amendment in the 1990 session.

applicability section. The regulations specifically provide that "closing, terminating or transferring operations," includes transfers of corporate stock or dissolution of a corporation which "indirectly through any of its subsidiaries owns or operates an industrial establishment." N.J.Admin.Code § 7:26B–1.5. The 1985 transaction resulted in the dissolution of Laboratories, which indirectly owned or operated the Freehold Facility as the 85% controlling shareholder of Cooper.

ECRA specifically exempts a "corporate reorganization not substantially affecting the ownership of the industrial establishment," § 13:1K–8, from its notice and reporting requirements. Laboratories asserts that on the statute's plain meaning, the 1985 dissolution and stock distribution did not affect the ownership of the Freehold Facility. The regulations define a "corporate reorganization not substantially affecting ownership" as

> the restructuring or reincorporation by the board of directors or the shareholders of a corporation, which does not diminish the availability of assets for any environmental cleanup, diminish the [DEP's] ability to reach the assets, or otherwise hinder the owner's or operator's ability to cleanup the industrial establishment, and where the purpose is ... to reorganize for any other reason related to financial, administrative, or managerial convenience, or for any other legitimate business purpose.

N.J.Admin.Code § 7:26B–1.3. Laboratories argues that its dissolution did not diminish the resources available to cleanup the Freehold facility because it had no effect on Cooper's corporate assets or liabilities and merely restructured Cooper's stockholder ownership.

The Court disagrees with Laboratories' interpretation of the statutory exemption. The liquidation of Laboratories substantially affected the ownership of Cooper, from being the 85 percent subsidiary of Laboratories, to becoming a completely independent corporation. Prior to the liquidation, Cooper's stock was held primarily by a corporation. Subsequent to the liquidation,

former Laboratories' shareholders held the majority of Cooper's stock. The Court does not find Laboratories' 1985 liquidation to be a structural reorganization "not substantially affecting ownership" within the meaning of ECRA.

Despite Laboratories' argument to the contrary, the Court cannot say that NJDEP's regulations exceed the agency's authority under ECRA or represent an unreasonable construction of the statute. This Court must defer to NJDEP's interpretation, since it appears to facilitate the goals of the statute.

In addition, the legislative policy to encourage private parties to clean up hazardous waste sites, without government-initiated litigation, is served by a broad construction of Section 13:1K–9. Any substantial change in ownership of an industrial facility, which has the potential to affect the assets available for cleanup, may serve as a transaction that triggers ECRA. In this way, many owners and operators of hazardous waste sites will be required to engage in environmental cleanup operations without extensive litigation initiated by NJDEP. Also, as explained in NJDEP's published responses to comments on the regulations, construing a change in ownership to exclude industrial establishments held by subsidiary corporations might encourage ECRA avoidance. 21 N.J.Reg. 2374 at ¶ 64 (Aug. 7, 1989). Companies could establish "shell" subsidiary corporations that never transfer an industrial establishment but are themselves transferred with the industrial establishments that they own. 21 N.J.Reg. 2374 (Aug. 7, 1989). Thus, the legislature's purpose in enacting ECRA is effectuated by holding that ECRA's notice and reporting requirements applied to the 1985 transaction.

**D. Parties Responsible for ECRA Compliance**

■ The next issue confronting the Court is to determine which parties were responsible for complying with ECRA's notice provisions. ECRA states that "an owner or operator of an industrial establishment" planning to terminate or transfer

operations shall notify NJDEP within five days after the public release of its decision to close or within five days of the execution of any agreement or sale or option to buy. N.J.Stat.Ann. § 13:1K–9.

### (1) *Cooper and Laboratories as Owners*

"Owner" is not defined in the statute.[11] The regulations define "owner" as a "person who owns real property of an industrial establishment or owns the industrial establishment." N.J.Admin.Code § 7:26B–1.3. Under this definition, Cooper is an "owner" of the Freehold Facility because it owned the facility and the real property on which it was located.[12] Even if it was an owner of the Freehold Facility, Cooper claims that it should not be liable for any cleanup costs because Laboratories, on its own, initiated the 1985 transaction that triggered ECRA. A company's role in initiating a transaction does not determine ECRA liability. For instance, ECRA is triggered by condemnation proceedings, where a company has no role at all in initiating a transaction. *Warren County v. Estate of Frank Percarpio*, 123 N.J.L.J. 825 (slip op.) (No. W–010737–86PW) (Super.Ct., Law Div., March 30, 1989). Thus, the Court finds that Cooper is an "owner" responsible for ECRA compliance.

■ Cooper claims that Laboratories was an "owner" of the Freehold Facility prior to its 1985 dissolution. Cooper argues that Laboratories was the true owner of the Freehold Facility because it held the

controlling interest in the stock of Cooper, which directly operated the Freehold Facility. The definition of "owner" in the regulations does not expressly make Laboratories liable as an owner of the Freehold Facility by virtue of its controlling interest in Cooper, in contrast to the definitions employed in other statutes.[13] However, other sections of the regulations suggest that NJDEP considers a controlling shareholder of a corporation to be an owner. For example, NJDEP refers to a change in ownership as including "transfer by any means of shares of a corporation which results in a change in the controlling interest in the owner or operator." N.J.Admin. Code 7:26B–1.3. As provided in the Applicability section, as discussed above, ECRA covers transactions such as the "sale or transfer of stock in a corporation which directly owns or operates, or indirectly through any of its subsidiaries, owns or operates an industrial establishment." § 7:26B–1.5. These sections, and others, in the regulations suggest that a parent corporation can be an indirect owner or operator of a facility if it holds a controlling interest in a subsidiary which directly owns or operates the industrial establishment. If, in NJDEP's view, ECRA applies to the 1985 transaction, it essentially means that a change in ownership of the industrial establishment has occurred. According to the regulations, the controlling interest in ownership of Cooper, and indirectly the Freehold Facility, was transferred from Laboratories to Cooper itself.

11. The statutory definitions of "owner" and "operator," in the context of other New Jersey statutes, are often co-extensive. *See, e.g.,* Self–Service Storage Facility Act, § 2A:44–188 ("owner means … operator"); Uniform Fire Safety Act, § 52:27D–196 ("owner means a person who exercises control"); Worker Health and Safety Act, § 34:6A–2 ("owner means the person possessing … actual control"); Carnival–Amusement Rides Safety Act, § 5:3–32 ("owner means any person who … controls or operates"); Urban Homesteading Act, § 40A:12–33 ("owner means … person … directly or indirectly in control"); Tenant Protection Act, § 46:8–38 ("owner shall mean a person … in whom is vested the rights of control"); Clinical Laboratory Improvement Act, § 45:9–42.27 ("owner means a person … in whom is vested the rights of control"); and Act Defining Responsibilities

of Ski Area Operators, § 5:13–2(a) ("operator means a person or entity who owns …").

12. In its reply brief, Cooper concedes that it might also have been deemed an owner or operator of the Freehold Facility at the same time it alleges that Laboratories was an owner or operator. Plaintiff's Reply Brief at 3.

13. For example, in the Major Hazardous Waste Facilities Siting Act, "owner or operator" expressly "includes, in addition to the usual meanings thereof, … any person or corporation which owns a majority interest in any other corporation which is the owner or operator of any major hazardous waste facility." N.J.Stat. Ann. § 13:1E–51(n). *See also* Sanitary Landfill Facility Closure and Contingency Fund Act, N.J. Stat.Ann. § 13:1E–102(b).

■ The comments accompanying the ECRA regulations clarify the agency's position on ownership. For instance, the agency's published remarks, in describing the change from the prior regulation's term "majority interest" to the "controlling interest" terminology in the current regulations, state that the new definition "better conveys the principle that certain shareholders, by virtue of their ownership of a certain percentage of stock ... have the power to direct ... the management and policies of a corporation." 21 N.J.Reg. 2369 at ¶ 25 (Aug. 7, 1989). NJDEP explains that the new definition "reflects the Department's practice of looking to the ability to control, as well as who has a majority of shares, as an index of ownership in a corporation." *Id.* In another statement, NJDEP asserts

> The Department uses 'controlling interest' as an index of ownership in a corporation. Under corporate law, each individual shareholder is an owner of a corporation. The Department recognizes that in large, publicly-held corporations a majority of the shareholders are passive investors.... The definition of 'controlling interest' is a hybrid; it uses both stock ownership and ability to control and direct the management and policies of a corporation.

21 N.J.Reg. 2370 at ¶ 28 (Aug. 7, 1989). While published agency statements accompanying regulations are certainly not entitled to the same deference as fully operative regulations, they serve to explain the agency's rationale in drafting the regulations. Evaluating the regulations as a whole, it seems that in NJDEP's view, Laboratories is liable for ECRA compliance as an owner. The Court must defer to NJDEP's interpretation because it cannot say that it is unreasonable, beyond the scope of legislature's delegation or would frustrate the goals of the statute.

**14.** The bankruptcy court mistakenly stated that this definition was included in the Spill Compensation and Control Act, not the Water Pollution Control Act, apparently confusing N.J.Stat. Ann. § 58:10 with § 58:10A.

**15.** The Spill Act's liability provision states that "[a]ny person who has discharged a hazardous

**(2)** *Laboratories as an Operator*

■ Cooper also asserts that Laboratories was an "operator" of the Freehold Facility. "Operator" is not defined in the statute or the administrative regulations. However, the term "operator" as used in other environmental statutes may provide some clues to the legislature's intent in including the term in ECRA. For instance, the New Jersey Water Pollution Control Act defines "operator" as "any person in control of, or having responsibility for, the daily operations of a facility." N.J.Stat. Ann. § 58:10A–22(i). In *In re Corona Plastics, Inc.*, 99 B.R. 231 (Bkrtcy.D.N.J. 1989), the bankruptcy court employed this definition of "operator" to determine if a trustee in bankruptcy could be held liable for violation of ECRA.[14] The court determined that a secured creditor was not an "operator" under ECRA because it did not meet this definition.

In *Ventron*, the case that inspired ECRA, the New Jersey Supreme Court interpreted the Spill Compensation and Control Act's definition of "person ... in any way responsible" for a hazardous substance to include a parent corporation that is "involved in the day-to-day operation [of its subsidiary]."[15] *Ventron*, 94 N.J. at 502, 468 A.2d 150. The court rejected the stricter traditional test of piercing the corporate veil to hold a parent corporation liable for the acts of its subsidiaries. *Id.* at 501, 468 A.2d 150. Courts have similarly found that a corporation which exercises management and control over its subsidiary may be liable as an operator under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq. See, e.g., United States v. Kayser–Roth Corp.*, 910 F.2d 24 (1st Cir.1990); *Mobay v. Allied–Signal, Inc.*, 753 F.Supp. 1248 (D.N.J.1991); *United States v. Nicolet, Inc.*, 712 F.Supp. 1193

substance or is in any way responsible for any hazardous substance which the department has removed or is removing ... shall be strictly liable, jointly and severally, without regard to fault for all cleanup and removal costs." N.J. Stat.Ann. § 58:10–23.11g(c).

(E.D.Pa.1989); *Rockwell Int'l Corp. v. IU Int'l Corp.*, 702 F.Supp. 1384 (N.D.Ill. 1988).

Several factors suggest that Laboratories, as a parent corporation holding a majority interest in Cooper, may be liable as an "operator" under ECRA. For example, in 1982, Laboratories incorporated Cooper as a wholly-owned subsidiary. Also in 1982, Laboratories transferred the assets and liabilities associated with its biomedical businesses, along with stock of certain subsidiaries engaged in such businesses, to Cooper. Cooper, in the ordinary course of business, used other subsidiaries of Laboratories as distributors for certain products. Immediately after acquiring the Freehold Facility in 1983, Laboratories transferred the property to Cooper as a major asset of the subsidiary company. In addition, Laboratories provided administrative and managerial services to Cooper including tax, treasury, legal, risk management services, corporate development, investor relations, data processing and financial reporting. According to Cooper's 1984 Annual Report to Stockholders, Cooper also relied on Laboratories to provide substantial financial resources that Cooper needed for acquisitions and other purposes.

This Court finds that this level of management and control, exercised by Laboratories over Cooper, is sufficient to hold Laboratories liable under ECRA as an operator. As either an owner or an operator, Laboratories, along with Cooper, was required to comply with ECRA's notice and reporting provisions prior to completing its 1985 liquidation.

### E. Cooper's Entitlement to Damages

■ The final issue presented by these motions is whether Cooper may maintain a private cause of action to recover a share of its cleanup costs from Laboratories. ECRA does not expressly create this remedy. Section 13:1K–13 of ECRA provides that:

Failure of the transferor to comply with any provision of this act is grounds for voiding the sale or transfer of an industrial establishment or any real property utilized in connection therewith by the transferee, entitles the transferee to recover damages from the transferor, and renders the owner or operator of the industrial establishment strictly liable, without regard to fault, for all clean-up and removal costs and for all direct and indirect damages resulting from the failure to implement a clean-up plan.

N.J.Stat.Ann. § 13:1K–13(a).

NJDEP regulations on the recovery of damages fail to discuss the appropriateness of a private cause of action under ECRA. The regulations merely state that:

(a) The transferee shall be entitled to recover damages from the transferor due to the voiding of the sale.

(b) Failure to comply with any provisions of the Act ... shall render the owner and operator of an industrial establishment strictly liable, without regard to fault, for all cleanup and removal costs and for all direct and indirect damages resulting from the failure to implement any cleanup plan necessary.[16]

N.J.Admin.Code § 7:26B–9.2.

Cooper relies on two provisions of ECRA in arguing that it is entitled to maintain this action to recover cleanup costs from Laboratories: (1) ECRA's provision that a transferee may void a transaction and recover damages from a transferor and (2) ECRA's strict liability provision with regard to cleanup costs. Laboratories asserts that no express transfer of the Freehold Facility occurred between the parties, and that Cooper is not a transferee within the meaning of the statute, since it possessed an ownership interest in the Freehold Facility prior to the 1985 liquidation. The Court will consider both the transferee provision and the strict liability provision in ascertaining whether ECRA allows Cooper to recover a share of its cleanup costs from Laboratories in a private suit for damages.

---

**16.** NJDEP stated in its published comments that liability under ECRA would be joint and several in accordance with the norm under other New Jersey environmental laws. 21 N.J.Reg. 2368 at ¶ 10 (Aug. 7, 1989).

To determine whether a statute affords a private right of action, New Jersey courts look to the analysis established in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Delaware Valley Transplant Program v. Coye*, 722 F.Supp. 1188, 1200 (D.N.J.1989); *In the Matter of State Comm'n of Investigation*, 108 N.J. 35, 41, 527 A.2d 851 (1987); *Jalowiecki v. Leuc*, 182 N.J.Super. 22, 29, 440 A.2d 21 (App. Div.1981). In evaluating whether a state statute implies a private cause of action, a court should consider three factors:

(1) Is the plaintiff 'one of the class for whose *especial* benefit the statute was engaged,'—that is, does the state create a [ ] right in favor of the plaintiff?

(2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

(3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted) (emphasis in original).[17]

Applying the first factor, ECRA appears to have been enacted primarily for the benefit of the citizens of New Jersey. As explained in the legislature's findings in the first section of the statute, ECRA's major purpose was to require that facilities that generate hazardous waste formulate cleanup plans prior to any closure, sale or transfer of operations. In this way, the state would avoid the time and expense required to pursue owners of such industrial establishments through litigation. By including the provision that a transferee may void a conveyance for non-compliance with ECRA and recover damages from a transferee, the legislature revealed another aim: to protect innocent parties from the expense associated with the cleanup of hazardous waste problems created by prior owners. Yet, on balance, the Court cannot say that ECRA was enacted for the "especial" benefit of companies in Cooper's position.

However, in considering the second factor, there is some indication that the legislature intended to create a private cause of action to allow an owner or operator to recover a share of cleanup costs from another owner or operator. By virtue of the strict liability clause, the legislature revealed its desire to impose cleanup costs on owners and operators. To effectuate this strict liability provision, it follows that one owner or operator should be able to recover a share of the cleanup costs from a co-owner or operator through litigation. In addition, the transferee provision reveals the legislature's intention to create a private right of action to allow a current owner to recover cleanup costs from the party responsible for ECRA compliance. While Cooper is not clearly a "transferee" within the meaning of the statute because it held an ownership interest in the Freehold Facility prior to the 1985 transaction, it is reasonable to conclude that the legislature intended the same remedy to apply to other changes in ownership.

Finally, to imply a private cause of action in this case is wholly consistent with the legislative purpose. To allow owners or operators to bring suit against co-owners or operators to recover cleanup costs will promote the legislature's goal of placing the financial burden of cleaning up hazardous waste sites on corporations responsible for such facilities, rather than state taxpayers. To imply a cause of action would extend to the co-owner/operator situation the reasoning of transferee provision. Furthermore, a private right of action would allow private parties to enforce the strict liability provision.

A careful consideration of the *Cort* factors leads this Court to conclude that ECRA provides a private right of action for the recovery of cleanup costs. This result is consistent with the interpretation of the transferee provision by New Jersey courts.

In *Dixon Venture*, the New Jersey Supreme Court has found that ECRA provides a private right of action to allow a transferee to sue a transferor for damages, even without voiding the transaction. 122

---

**17.** The Court in *Cort* also considered a fourth factor based on federalism concerns, which would only be applicable to a federal statute. 422 U.S. at 78, 95 S.Ct. at 2088. New Jersey courts employing the *Cort* test have therefore relied only on the first three factors. *See Comm'n of Investigation*, 108 N.J. at 41, 527 A.2d 851.

N.J. at 236, 584 A.2d 797. In its *per curiam* affirmance, the Supreme Court endorsed the rationale of the Appellate Division's holding that a private right of action may be implied under ECRA. *Id.* The Appellate Division relied on the clear language of the statute which stated that "failure to comply with any of the provisions of this act ... entitles the transferee to recover damages from the transferor." *Dixon Venture*, 235 N.J.Super. at 110, 561 A.2d 663. The court further explained that a suit for damages was a well-established common law remedy available to a transferee of real property when the transferor has failed to discharge its legal obligations. *Id.* Nothing in ECRA's language or policies suggested that ECRA intended to restrict these remedies. *Id.* The court mentioned that its conclusion was not affected by the regulation providing for recovery of damages due to voiding the transaction. *Id.* at 112, 561 A.2d 663. *See* N.J.Admin. Code § 7:26B–9.2. The regulation was presumed to be simply a reiteration of a transferee's statutory right to void a conveyance and not as negating other statutory remedies. *Id.*

The court also explained that its conclusion was supported by dicta in *Superior Air Products Co. v. NL Industries, Inc.*, 216 N.J.Super. 46, 63, 522 A.2d 1025 (App. Div.1987). The court in *Superior Air Products* stated:

> [T]he simple aim of ECRA is swift and thorough cleanup through a regulatory process; when an ECRA proceeding is pending, the liability determination must be left to resolution in an action among the former and present owners and possessors of the property.

*Id.* at 65, 522 A.2d 1025.

▮ This Court believes that the reasoning of *Dixon* and *Superior Air Products* should be extended to cover the situation in this case. ECRA is more than a buyer protection statute. It represents the considered judgment of the legislature that environmental problems should be remedied prior to any substantial change in ownership of a hazardous waste facility. Allowing a company involved in a change of ownership to bring suit to recover part of its cleanup costs from another corporation that was also intimately involved in the change of ownership serves ECRA's aim of placing cleanup costs on responsible parties, rather than taxpayers.

This result is also consistent with the approach taken by other courts, who have determined that other state environmental statutes imply extremely broad private rights of action to enforce the statute. For example, in *Snyder v. Jessie*, 145 Misc.2d 293, 546 N.Y.S.2d 777 (Sup.Ct.1989), the court concluded that a strict liability provision [18] in the New York Navigation Law that governed oil spills permitted a plaintiff to pursue a cause of action against a defendant who had discharged oil in violation of the statute. The court therefore allowed a homeowner to sue an oil company that had pumped oil into a neighboring tank which overflows onto plaintiff's property.

Similarly, in *Bagley v. Controlled Environment Corp.*, 127 N.H. 556, 503 A.2d 823 (1986), the Supreme Court of New Hampshire found a private cause of action based on the strict liability provision [19] of a New Hampshire statute regulating the disposal of hazardous wastes, even absent any indication that the legislature intended to create such an action. This statutory provision allowed the attorney general to bring suit but did not mention suits by private parties. The court found that a private cause of action would be appropriate to compensate property owners for damages caused by hazardous waste disposal.

This Court believes that ECRA's goals would be served by allowing private suits

---

**18.** The provision stated:
 Any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained as defined in this section. N.Y.Nav.Law § 181.

**19.** The provision stated: an operator who disposes of hazardous waste 'in violation of RSA 147–A or rules adopted or permits issued under RSA 147–A' shall be 'strictly liable' for costs of containment, cleanup and removal of hazardous wastes, and that the attorney general may institute an action to recover these costs. *Bagley*, 503 A.2d at 828.

by owners or operators for the recovery of cleanup costs from joint owners or operators who fail to comply with the statute. In this case, if this suit is not allowed to go forward, Cooper will be solely responsible for cleaning up the Freehold Facility whereas Laboratories will avoid all cleanup costs, despite its at least 85 percent ownership interest in Cooper from 1982 to 1985 and its participation in the management of the subsidiary.[20] Such a result would be inconsistent with the policy goals of the statute.

### III. CONCLUSION

For the reasons expressed in this Opinion, the Court will deny Laboratories' motion to dismiss and will grant, in part, Cooper's motion for partial summary judgment.

---

**20.** Laboratories argues that Cooper should not be allowed to recover damages from Laboratories because Cooper was *in pari delicto* with Laboratories in failing to comply with ECRA. Applying the reasoning of *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), which strongly disfavored application of the defense where it would frustrate an important public policy, the Court finds that the defense is not available in this case.