**FEDERAL INSURANCE COMPANY, By and Through ASSOCIATED AVIATION UNDERWRITERS, Plaintiff,**

v.

**PUREX INDUSTRIES, INC., Defendant.**

**PUREX INDUSTRIES, INC., Counter–Claimant,**

v.

**FEDERAL INSURANCE COMPANY By and Through ASSOCIATED AVIATION UNDERWRITERS, Houston Fire & Casualty Insurance, by and through Geico General Insurance Co., and Liberty Mutual Insurance Co., Counter-defendants.**

**Civil Action No. 93–393(JBS).**

United States District Court, D. New Jersey.

June 27, 1997.

---

874

Jeffrey W. Moryan, Connell, Foley and Geiser, Roseland, NJ, and Gwen Freeman, Knapp, Petersen & Clarke, Glendale, CA, for Plaintiff and Counter–Defendant Federal Insurance Company by and through Associated Aviation Underwriters.

Stanley M. Spracker, Kenneth L. Doroshow, Weil, Gotshal & Manges, Washington, D.C., and George J. Tyler, Michael J. Canning, Giordano, Halleran & Ciesla, Middletown, NJ, for Defendant and Counter–Claimant, Purex Industries, Inc.

John C. Sullivan, Kathleen K. Kerns, Law Offices of Stanley P. Stahl, Voorhees, NJ, for Counter–Defendant Liberty Mutual Ins. Co.

Stephen J. Smirti, Jr., Pia E. Riverso, Rivkin, Radler & Kremer, Uniondale, N.Y., and Joni F. Mason, Rivkin, Radler & Kremer, Newark, NJ, for Counter–Defendants GEICO General Insurance Company and Houston General Insurance Company.

### OPINION

SIMANDLE, District Judge:

### CONTENTS

I. Background and Procedural History ........................................876

II. Discussion.................................................................877
 A. Summary Judgment Standard .........................................877
 B. Motion by Counter–Defendants for Summary Judgment on Statute of
 Limitations Grounds...............................................878

 1. Choice of Law ............................................................878
 2. Application of New Jersey Statute of Limitations ........................879
 C. Cross-Motions for Summary Judgment on the Issue of Late Notice ...........880
 1. Timeliness of Notice ..................................................881
 2. Prejudice to Insurers from Late Notice ...............................882
 D. Cross–Motions for Summary Judgment on the Issue of Whether Purex's
 Remediation and Compliance Costs Are Damages ........................882
 E. Purex's Motion for Summary Judgment on the Applicability of the Owned
 Property Exclusion ......................................................883
 F. Cross–Motions for Summary Judgment on the Issue of the "Voluntary
 Payments" Exclusion ...................................................885
 G. GEICO and Houston General's Motion for Summary Judgment Regard-
 ing Mitigation of Damages and Purex's Cross–Motion for Summary
 Judgment on the Reasonableness of Its Cleanup Plan ....................886
 H. Liberty Mutual's Motion for Summary Judgment on the Grounds of a
 "No Assignment" Clause in Its Policy ...................................889
 I. AAU's Motions for Summary Judgment Regarding Specific Policy Cover-
 age and Non–Cumulation of Policy Limits ..............................890
 1. Policy Number SP1–1195–LA .........................................890
 2. Policy No. AP1–825/Binder No. B1–122859 ............................891
 3. Non–Cumulation of AAU Policies .....................................892
 J. Insurers' Motion for Summary Judgment as to Defense Costs ...............892

III. Conclusion ...................................................................893

---

## I. Background and Procedural History

This insurance coverage case was instituted by Federal Insurance Company (also known as Associated Aviation Underwriters, or "AAU") to seek a declaration of its responsibilities, if any, under certain policies of insurance issued to an entity known as Airwork Corporation, a now-defunct corporation whose assets were ultimately purchased by a wholly-owned subsidiary of defendant and counter-plaintiff Purex. Airwork operated an aircraft engine repair facility in Millville, New Jersey, from the mid–1940s until mid–1968.

Purex acquired Airwork Corporation in 1968 and Airwork operated the Millville facility under Purex's ownership from 1968 through 1985, when Purex sold the stock of Airwork to UNC Resources, triggering obligations under Environmental Cleanup Responsibility Act ("ECRA"), NJSA 13:1K–6 et seq. ECRA required that owners and operators of industrial establishments remediate their facilities as a precondition to the closure, sale or transfer of their business operations.

By late 1985, it became clear that the NJDEP would not give clearance in time for a December 31, 1985 sale date. Purex entered into an Administrative Consent Order ("ACO") with the NJDEP on December 12, 1985. The ACO allowed sale to go forward and set forth a timetable for compliance with ECRA. Under the terms of the ACO, the NJDEP reserved the right to pursue Purex under other environmental statutes.

Groundwater sampling at the Millville site first took place in late 1987. A report dated December 11, 1987 confirmed the presence of groundwater and soil contamination. After negotiations with the NJDEP and its environmental consultants, Purex submitted a cleanup plan to the NJDEP in late 1992, the core element of which is a pump and treat system. On June 2, 1993, the NJDEP issued a "Draft Cleanup Plan Approval." Purex began construction of the pump and treat remediation system in 1993 and began fully operating the system in March 1994.

To date, Purex claims to have incurred more than $12,000,000 in order to comply with its ECRA liabilities.

AAU instituted the instant declaratory judgment action in the Central District of California on July 15, 1992. Purex filed a motion to transfer the case to the District of New Jersey under 28 U.S.C. § 1404(a), which motion was granted by Honorable Terry J. Hatter, U.S.D.J., in January, 1993. After the transfer, in March, 1993, Purex filed a

counterclaim against GEICO (denominated Houston Fire Insurance Company in the pleading) and Liberty Mutual. The present case, docketed in this court at Civil Action No. 93–393(JBS), has gone forward through the case management process.

Prior to the institution of these proceedings, other related suits were filed. Purex instituted an action in the California Superior Court in March, 1983 seeking coverage from several of its insurers for pollution claims at distinct sites. That action was styled *Purex Industries, Inc. v. Leslie Walpole Proctor, et al.*, No. C446935 (*"Purex I "*). None of the insurers in the present case were parties to that action, and the case, as originally filed, did not state a claim for coverage for the ECRA claim arising out of the pollution of the Millville site.

After filing a second suit in the California Superior Court captioned *Purex Industries, Inc. v. American International Underwriters Ins. Co., et al.*, No. C653256 (*"Purex II "*) on July 6, 1987, which involved the Millville site but which was dismissed prior to service of process upon the insurers, Purex filed an action in the Superior Court of New Jersey styled *Purex Industries, Inc. v. American International Underwriters Ins. Co.*, No. L–084740–87 (*"Purex III "*), on July 16, 1987. The purpose of that suit was to determine coverage for damages incurred from pollution at the Millville site. Houston Fire (GEICO) was named as a defendant in the original complaint in *Purex III,* as was AAU; Liberty Mutual was added as a defendant by way of an amendment to the complaint on August 3, 1987.

*Purex III* was ultimately the subject of an injunction in the California court in *Purex I.* An insurer not a party to the instant case, Harbor Insurance Company, filed a motion to enjoin Purex from proceeding with the *Purex III* litigation in New Jersey because it viewed the suit as multiplicitous. Judge Markey of the California Superior Court granted the motion in *Purex I* in 1987. Judge Markey's Order was affirmed on appeal on March 21, 1989. Consequently, Purex voluntarily dismissed *Purex III* in New Jersey without prejudice to Houston Fire (GEICO), AAU and Liberty Mutual. On September 18, 1989, Purex filed a third amended complaint in *Purex I* in California in order to put, *inter alia,* the Millville site at issue. Additionally, Purex's third amended complaint named additional insurers. Purex did not, however, name Liberty Mutual, AAU, or GEICO as defendants. The litigation proceeded in phases, with trial on a New York pollution site going to the jury in March, 1993. On June 2, 1993, eleven months after the instant litigation was instituted, the Millville phase of the *Purex I* trial began. It settled after the first day of trial. *Id.,* ¶ 85.

Presently before the court are a voluminous set of summary judgment motions on behalf of Purex, AAU, GEICO, Houston General and Liberty Mutual.

## II. *Discussion*

### A. *Summary Judgment Standard*

The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding whether there is a disputed issue of material fact the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080–81 (3d Cir. 1996); *Kowalski v. L & F Products,* 82 F.3d 1283, 1288 (3d Cir.1996); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that: "[w]hen the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of

persuasion at trial." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–330 (3d Cir.1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). However, "the nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial." *Brewer*, 72 F.3d at 330 (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

B. *Motion by Counter–Defendants for Summary Judgment on Statute of Limitations Grounds*

GEICO and Houston General move for summary judgment on Purex's counterclaim on the basis of the statute of limitations. Liberty Mutual has filed a separate motion on the same ground, and AAU has filed a notice of joinder to the motions of GEICO, Houston General and Liberty Mutual. Although the moving parties (referred to collectively as "the insurers") make slightly different arguments, the Court will treat the motions as one motion which presents the question of whether the counterclaim asserted by Purex against the insurers should be dismissed because the statute of limitations has run.

1. *Choice of Law*

As a threshold issue, the parties raise the question of whether this court should apply the statute of limitations of California or New Jersey.

 Because this lawsuit was transferred to the District of New Jersey from U.S. District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a), this court, as the transferee court, must ap-

ply the choice of law rules which govern in California district court. *See Ferens v. John Deere Co.*, 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (holding that transferee court must apply choice of law rules of transferor court, regardless of who initiated transfer). The question for the court then is whether a California choice of law analysis would support the application of New Jersey's statute of limitations to a counterclaim filed after the case had been transferred to the District of New Jersey.

California applies the modern governmental interest analysis to choice of law issues. *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 484 (9th Cir.1987). Under that approach, the court first determines whether the laws of the two jurisdictions differ. *Id.* Here, that question is answered in the affirmative; the applicable New Jersey statute of limitations is six years, N.J. Stat. Ann. § 2A:14–1, while the applicable California statute of limitations is four years, Calif. Code of Civ. Pro. § 337.

Second, the California courts determine whether both states have an interest in applying their respective law. "If only one state has an interest, there is no 'true conflict' of laws and the court should apply the law of the interested jurisdiction." *Ledesma*, 816 F.2d at 484. In applying statutes of limitations to causes of action, both New Jersey courts and California courts have articulated an interest stimulating litigants to pursue a cause of action within a reasonable time so that the opposing party may have an opportunity to defend, thus preventing the litigation of stale claims.

The insurers argue that a false conflict exists because New Jersey does not have any discernable interest in applying its longer statute of limitations since it would not advance its policy of preventing stale litigation. Purex, on the other hand, argues that California has no interest in applying its statute of limitations to Purex's counterclaims which were filed after this case was transferred to New Jersey, but that New Jersey has a clear and strong interest in applying its statute of limitations, along with its substantive law,

because the site of the environmental cleanup at issue is located in New Jersey.

The court disagrees with the insurers' position that New Jersey has no interest in applying its own six year statute of limitations instead of California's shorter statute of limitations. New Jersey has determined that a six year time period is sufficient to prevent the litigation of stale claims and thus the application of the New Jersey statute of limitations would advance New Jersey's policy, despite the fact that it is longer than the California alternative. Further, a party that files a counterclaim in a case after it has been transferred to New Jersey may reasonably rely on the statute of limitations which governs actions in New Jersey. California has no similar interest in this case, or its litigants, especially in light of the fact that the counterclaim was not filed in California.

The court concludes, therefore, that the application of California choice of laws rules supports the application of New Jersey's statute of limitations to the present case. As a final note on the choice of law issue, the court is not persuaded to reach a different conclusion based on its earlier decision that a California court would not apply New Jersey's entire controversy doctrine to the instant action. That decision relied in part on the inequity of applying New Jersey's unique doctrine of preclusion to unwary litigants who initiated litigation in California. Here, however, there is no reason to prevent a party to a case that has been transferred to New Jersey from relying on New Jersey's statute of limitations as it applies to a counterclaim raised after the transfer.

2. *Application of New Jersey Statute of Limitations*

■ In applying the six year statute of limitation to Purex's counterclaim, the court must next determine when that cause of action accrued. In its counterclaim, Purex seeks a declaration that the insurers have a duty to defend and indemnify Purex for all losses, liabilities and expenses arising from its cleanup of the Millville site including any claims or lawsuits relating to the same; and that the insurers owe a duty to reimburse Purex for expenses and costs associated with the Millville site and this lawsuit concerning coverage. The counterclaim was filed against AAU in August 1992; against Liberty Mutual in March 1993; GEICO in September 1993; and Houston General in April 1995.

Both Purex and the insurers rely on two cases for the proposition that under New Jersey law, a claim by an insured against its insurer accrues when the underlying judgment becomes final and the insurer's liability is finally determined. *Kielb v. Couch,* 149 N.J.Super. 522, 374 A.2d 79 (Law Div.1977); *Impex Agricultural Commodities v. Leonard Parness Trucking Corp.,* 582 F.Supp. 260 (D.N.J.1984).

From this proposition, the insurers argue that Purex's cause of action against the insurers accrued in December 1985 when it executed the ACO [1], thereby fixing its liability for the cleanup of the Millville site. They assert that by signing the ACO, Purex established its liability for the cleanup and thus any duties and obligations of the insurers arose at that time.

In contrast, Purex argues that under this same proposition of law, its cause of action against the insurers has not yet accrued because its liabilities in connection with the cleanup are not yet fully resolved and the NJDEP's administrative proceeding against Purex, *In the Matter of Airwork Corp. and Purex Indus., Inc.,* ECRA Case NO. 85529, is not yet concluded. Purex also relies on an unpublished decision from this court which held that "an insured's cause of action against its insurer should not accrue until that action is completed, that is, when an insured finally settles the claim, not while the insured is still threatened with suit." *Polerized Schiabo NEU Co. v. Hartford Accident and Indem. Co.,* No. 94–CV–4857 (SMO) (D.N.J. May 22, 1996) (holding that limita-

1. Liberty Mutual claims that at the latest, Purex's cause of action accrued in August 1987 when it alleged in pleadings in another lawsuit that Liberty Mutual and other insurers had breached their contractual obligations to Purex. A declar- atory action may be brought, however, before a cause of action arises for breach of contract. Purex's action in 1987 did not start the limitations period running if its cause of action had not otherwise accrued.

tions period did not begin to run when party voluntarily agreed to clean up property).

By analogy Purex argues that although it entered the ACO in December 1985, it remained and continues to remain subject to threats of litigation from the NJDEP and neighboring landowners under ECRA, the Spill Act, and other environmental statutes. The ACO specifically provides that its execution "shall not preclude" NJDEP from requiring compliance with other environmental statutes. Purex thus concludes that its cause of action will not accrue until the ECRA action against it is closed.

In the alternative, Purex argues that its cause of action accrued in June 1993, when the NJDEP gave approval to a proposed cleanup plan. Purex contends that the approval of its plan is closest analogy to a final judgment of liability in this case.

The court finds that Purex's claim is not untimely under New Jersey's six year statute of limitations. The insurers' claim that the liability of Purex was finally determined by the signing of the ACO is unpersuasive. The ACO merely required testing of environmental conditions and remediation of contamination that might be discovered. In other words, liability was not finally determined at this point because any liability was contingent upon the discovery of contamination. Reports of contamination at the Millville site were not confirmed until December 1987.[2]

The claims against Purex by the NJDEP under ECRA remain unresolved. Although Purex has submitted a cleanup plan and begun remediation under the plan, it insists that the NJDEP may still modify the plan or bring suit under a number of environmental statutes. Summary judgment will thus .be denied on the grounds of the statute of limitations as the insurers have not proved as a matter of law that the counterclaims asserted by Purex were untimely.

Although not necessary to this decision, the court also notes that Purex's counterclaims would be timely under an alternative

theory not mentioned by the parties—that the declaratory claim accrues when the insured's claim for coverage is denied on the merits, in alleged breach of the contract of insurance. *Sybron Chemical v. Security Ins. Co,* No. PA–L 1307–94 (N.J.Super.L.Div., Dec. 9, 1996), *citing Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994 (D.N.J.1988). Such a construction makes sense if the insurer is concerned about an indefinite length of future risk in a remediation process that may consume years before the full extent is known. In the present case, this construction is of no avail to the insurers, which did not deny coverage on the merits of Purex's claims until after this suit was filed in 1992.

In any event, the court holds that Purex's counterclaims for declaratory relief are not time barred.

## C. *Cross-Motions for Summary Judgment on the Issue of Late Notice*

Counter-defendants GEICO and Houston General have moved for summary judgment seeking dismissal of Purex's counterclaim on the grounds that Purex failed to give timely notice of its claim pursuant to the notice provisions of the insurance contract. AAU filed a notice of joinder to the motion of GEICO and Houston General. Purex has also moved for partial summary judgment on the "late notice" defense asserted by the insurers, to which GEICO and Houston General and Liberty Mutual have responded.

New Jersey law is clear that an insurer may deny coverage on the basis of a notice clause only after proving both that the insured breached the notice provision and that the insurer suffered a likelihood of appreciable prejudice as a result. *Cooper v. Government Employees Ins. Co.,* 51 N.J. 86, 94, 237 A.2d 870 (1968); *Morales v. National Grange Mut. Ins. Co.,* 176 N.J.Super. 347, 423 A.2d 325 (Law Div.1980). The court will first examine the question of whether Purex breached the notice provision by failing to provide timely notice.

**2.** None of the parties argue that Purex's cause of action accrued on this date, which falls within the six year statute of limitations for all parties, with the possible exception of Houston General, who was originally brought into this suit in

March 1993, but dismissed without prejudice in September 1993. In 1995, Houston General was again added as a defendant in Purex's Third Amended Counterclaim.

### 1. *Timeliness of Notice*

■ GEICO and Houston contend that coverage under its policy is conditioned upon the requirement that Purex give the insurer notice of an "occurrence of an event" as soon as reasonably possible, and that Purex immediately provide notice of a claim made or suit brought against it. The relevant policy language is as follows:

> Upon the occurrence of an event, written notice shall be given by or on behalf of the Insured to the Insurer (or any of their duly authorized agents) as soon as reasonably possible. Such notice shall contain particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the event, the name and address of the injured and of any available witnesses.

> If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Insurer every demand, notice summons, or other process received by him or his representatives.

Purex claims that it gave notice to GEICO and Houston General by letter in April 1986, and that at the very latest, all of the insurers had notice by August 1987, when Purex filed and served its Amended Complaint in the New Jersey State Action. The insurers argue that this notice was late because prior to August 1987, Purex had knowledge of several occurrences at the Millville plant, dating back to the early 1970s, which indicated that contamination existed at the site for which Purex would be liable. In the alternative, the insurers argue that Purex breached by failing to give notice prior to December 1985, when Purex signed the ACO, because at that point Purex knew that NJDEP had a possible claim against it and that Purex would be liable for the cleanup of any contamination found at the site.

Purex contends that its obligation to provide notice did not arise with the signing of the ACO because its liability under the ACO was contingent upon the discovery of contamination at the Millville site. Groundwater contamination at the site was not reported until December 1987. Only then, Purex argues, did Purex have knowledge that an insured loss was occurring.

The disagreement between the parties boils down to whether it was reasonable for Purex to delay in notifying the insurers once it had knowledge that it would be liable pursuant to the ACO for any contamination that was found at the site. The inquiry is further complicated by the factual dispute over whether Purex might have known that contamination would be found, and whether, prior to December 1987, Purex was aware of the existence of contamination at the site caused by prior events chronicled by GEICO and Houston General in their motion.

Purex denies having knowledge of contamination until December 1987. The insurers, however, argue that Purex became aware that its waste disposal practices and operations resulted in obvious signs of contamination in 1982; that Purex was aware of soil contamination at the site by October 1985; and that Purex knew from the outset of the ECRA case that litigation under various environmental statutes was possible.

The determination of whether Purex gave notice to its insurers within a reasonable time, " 'depends on the facts and circumstances of the particular case,' and is a question of fact for resolution by the jury or factfinder, unless the facts are undisputed and different inferences cannot reasonably be drawn therefrom." *Figueroa v. Puter,* 84 N.J.Super. 349, 354, 202 A.2d 195 (App.Div. 1964). The cases cited by the parties are distinguishable on the facts and do not dictate a resolution of the late notice issue in this case as matter of law. *See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 817 F.Supp. 1136 (D.N.J.1993), *aff'd,* 89 F.3d 976 (3d Cir.1996); *Sagendorf v. Selective Ins. Co.,* 293 N.J.Super. 81, 679 A.2d 709 (App.Div.1996); *Reichhold Chemicals, Inc., v. Hartford Acc. & Indem. Co.,* 1993 WL 512621 (Conn.Super.Ct.1993).

Since there are clearly disputed issues in this case which impact the determination of whether Purex gave notice to the insurers within a reasonable time, the court finds that the insurers have failed to establish as a matter of law that Purex failed to give timely notice. Likewise, Purex has failed to estab-

lish as a matter of law that the insurers' late notice defense is without merit. Thus, the existence of genuine issues of material fact preclude summary judgment for all parties on the issue of late notice.

### 2. Prejudice to Insurers from Late Notice

■ Because the fact issue regarding whether Purex breached the notice provisions disposes of the motions for summary judgment, the court need not reach the question of whether the insurers suffered prejudice. The court will note, however, as a preliminary matter, that the insurers will be required to show a likelihood of appreciable prejudice in order to prevail on their late notice defenses. The court is not persuaded by the insurers' argument that they need not show prejudice because the insurance policies in question were not contracts of adhesion, but were negotiated and bargained for by Purex. While some of the terms of the policy may have been subject to such negotiation and approval, the boilerplate language used in the notice provisions of the policies at issue is similar, if not identical, to the language interpreted by courts in this district that have applied the appreciable prejudice requirement in other environmental insurance cases. See Chemical Leaman Tank Lines v. Aetna Cas. and Sur. Co., 817 F.Supp. 1136 (D.N.J.1993), aff'd, 89 F.3d 976 (3d Cir.1996); Hatco Corp. v. W.R. Grace & Co., 801 F.Supp. 1334, 1371–72 (D.N.J.1992). Further, the insurers have pointed to no case law that would suggest that an insurer is exempt from the prejudice requirement for the reasons stated.

### D. Cross-Motions for Summary Judgment on the Issue of Whether Purex's Remediation and Compliance Costs Are "Damages"

■ Counter-defendant Liberty Mutual has moved for summary judgment on Purex's counterclaim, asserting that the costs incurred by Purex under ECRA are costs of doing business, and do not constitute "damages" under its policy provisions. AAU, GEICO and Houston General have moved to join Liberty Mutual's motion. Purex has

also moved for partial summary judgment on this issue. For the reasons below, Purex's motion will be granted, and the insurers' motions will be denied.

The insurers policies each contain boilerplate language that requires the insurers to pay on behalf of Purex "all sums which the insured shall become legally obligated to pay as damages because of injury to property." The insurers argue that Purex's environmental cleanup and remediation costs under ECRA are not "damages" that are covered by their policies.

The insurers' argument is plainly contrary to established New Jersey law. The New Jersey Supreme Court has held that "environmental-response costs and remediation expenses ... constitute sums that the policyholder will have to pay 'as damages' because of property damage, within the meaning of the CGL policies at issue." General Acc. Ins. Co. v. State Dept. of Environ., 143 N.J. 462, 672 A.2d 1154 (1996) (citing Morton Int'l v. General Accident, 134 N.J. 1, 27, 629 A.2d 831 (1993)). The Morton court found that the "plain, non-technical meaning" of damages encompasses response costs imposed to remediate environmental damages. 134 N.J. at 25, 629 A.2d 831.

Courts applying New Jersey law have uniformly followed Morton in finding that environmental remediation costs are damages under general liability policies. See, e.g. Metex Corp. v. Federal Ins. Co., 290 N.J.Super. 95, 103, 675 A.2d 220 (App.Div.1996); for an earlier exposition of the same principle, see Township of Gloucester v. Maryland Cas. Co., 668 F.Supp. 394, 398 (D.N.J.1987). New Jersey courts have also applied the Morton holding in the specific context of ECRA actions. Ohaus v. Continental Cas. Ins. Co., 292 N.J.Super. 501, 509–10, 679 A.2d 179 (App.Div.1996) (finding "damages" to include monitoring, investigating and testing expenses under ECRA); Crest–Foam Corp. v. Hartford Accident and Indem. Co., No. L–1068–93 (N.J.Super.Law Div. Jan. 24, 1996) (holding ECRA clean-up costs are damages which insured is "legally obligated to pay").

In its opposition to Purex's motion for summary judgment, Liberty Mutual backs down somewhat from its initial position and

claims that the costs incurred in connection with the cleanup of a polluted site do not automatically qualify as "damages" under general liability policies. Relying on the unreported decision in *United Mobile Homes, Inc. v. Foremost Ins. Co.*, 292 N.J.Super. 492, 679 A.2d 174 (App.Div. 1996), Liberty Mutual claims that summary judgment should be denied because Purex has assumed that any amount spent at the Millville site falls within the scope of the damages provision in its policies.

Liberty Mutual has failed, however, to raise any fact which suggests that Purex has incurred any costs that were beyond the scope of the NJDEP's remedial orders. To the extent that the costs incurred by Purex in connection with the cleanup and remediation are excluded from coverage under other provisions of the insurance contracts, the insurers are not foreclosed from making those arguments by the entry of summary judgment in Purex's favor on this issue. The court will therefore grant partial summary judgment in Purex's favor on the issue that sums for which it incurs in remediating the Millville site are "damages" under the insurance policies that may be recovered if the insurers fail to prove that coverage is excluded under any other provision of the policies. *See Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 98 N.J. 18, 26, 483 A.2d 402 (1984) (finding insurer bears burden of establishing that any matter falls within exclusionary provisions of policy).

E. *Purex's Motion for Summary Judgment on the Applicability of the Owned Property Exclusion*

█ Purex seeks partial summary judgment on the issue of whether the owned property exclusion contained in the policies of the insurers applies to the damages for which it seeks coverage. The insurers have each raised this exclusion as an affirmative defense. Four of the seven policies at issue, AAU policies SP1–1195, SP1–1211–LA, Binder B1–122859 and Houston Fire & Casualty policy number UAP–1150, contain the following owned property exclusion:

EXCLUSIONS This policy does not apply:

A. Under Coverage A, to injury to or destruction of:

1. Property owned by the Insured; or

. . .

3. Property rented to, occupied or used by or in the care, custody or control of the Insured to the extent the Insured is under contract to provide insurance therefor.

The Liberty Mutual primary policies at issue exclude property damage to:

1) property owned or occupied by or rented to the Insured,

2) property used by the Insured

3) property in the care, custody or control of the Insured or as to which the insured is for any purpose exercising physical control . . .

Finally, the Liberty Mutual excess policy excludes damage to "property rented to, used by, or in the care, custody or control of the insured."

Purex argues that these provisions do not apply to groundwater contamination as a matter of law because New Jersey courts have held that groundwater below real property is not owned by the property owner. This proposition of law is upheld and supported by a series of eight opinions issued by the appellate division last summer. *See, e.g., Reliance Ins. Co. v. Armstrong World Indus.*, 292 N.J.Super. 365, 678 A.2d 1152 (App. Div.1996); *Strnad v. North River Ins. Co.*, 292 N.J.Super. 476, 679 A.2d 166 (App.Div. 1996); *Kentopp v. Franklin Mut. Ins. Co.*, 293 N.J.Super. 66, 679 A.2d 701 (App.Div. 1996). Those opinions apply the holding in *Morrone v. Harleysville Mut. Ins. Co.*, 283 N.J.Super. 411, 419–20, 662 A.2d 562 (App. Div.1995), that groundwater contamination is not excluded by the "owned property" exclusion in CGL policies.

Liberty Mutual and AAU, in response to Purex's motion, argue that in this line of cases, the appellate division incorrectly seeks to limit the application of the owned property exclusion. The insurers contend that groundwater should continue to be treated as property for the purposes of the owned property exclusion because *Morrone*, upon which the appellate division relies, is "ill-consid-

ered." They further claim that based on recent trends, the New Jersey Supreme Court will most likely reverse the appellate division decisions in whole or in part. This court does not share that view.

*Morrone* does not contradict any New Jersey Supreme Court precedent, including *State v. Signo Trading Int'l, Inc.,* 130 *N.J.* 51, 612 A.2d 932 (1992), and has not itself been overruled or distinguished. While it is the job of a district court applying state law to anticipate how the state's highest court will eventually determine an issue, there is no basis on which to conclude that the Supreme Court will reverse the line of cases which determines that groundwater does not fall within the owned property exclusion.

The insurers also attempt to distinguish *Morrone* on the basis that it dealt with a duty to defend context and not a claim for indemnification of remediation of groundwater. The appellate division cases which follow *Morrone,* however, apply to a variety of contexts, including those for indemnification of remediation costs. The court finds the insurers' argument unpersuasive. As there is no factual dispute over the existence of groundwater contamination at the Millville site, and New Jersey law on the issue is quite clear, summary judgment will be entered in favor of Purex to the extent that the court finds that the owned property exclusion does not apply to remediation of contaminated groundwater.

■ The insurers raise a second point in their motion. They argue that even if the court finds that coverage for the remediation efforts undertaken by Purex for groundwater contamination are not precluded by the owned property exclusion, apportionment of costs is appropriate because certain costs, such as the remediation of soil at the Millville site's PT–6 Test Cell, were solely related to Purex's "owned property."

The insurers cite a passage from *Strnad,* 292 N.J.Super. at 482, 679 A.2d 166, for the proposition that not all on-site cleanup expenses are covered simply because some off-site damage has occurred:

> ... other costs associated with remediating the site—for example soil excavation,

and fill and tank removal—should not be considered covered damages **except to the extent that they are deemed costs reasonably associated with groundwater remediation.** The soil and tanks were clearly "owned property." (emphasis added).

The insurers argue that the remediation of soil at the PT–6 Test Cell was not related to groundwater contamination because the NJDEP never required Purex to remediate groundwater in that area.

Purex, however, seeks coverage for remediation of on-site soil contamination as well as groundwater contamination, arguing that soil remediation was necessary to prevent further damage to groundwater. *See F.L. Smidth & Co. v. The Travelers Ins. Co.,* 292 N.J.Super. 483, 489, 679 A.2d 170 (App.Div.1996) ("Under *Signo,* the costs of remediating the soil pollution causing the groundwater contamination may be covered." Purex presents evidence that soil contamination at PT–6 Test Cell area was identified as the source of groundwater contamination by ERM Northeast, Purex's environmental consultant. (PSMF ¶ 39). The NJDEP was willing to consider natural remediation of the contaminated groundwater at the PT–6 Test Cell in part because Purex had remediated the source of that contamination—the contaminated soil. (PSMF ¶ 42).

The insurers have not presented evidence to contradict Purex's contentions. They have also failed to present evidence that any of the remediation costs incurred by Purex, including those costs incurred for soil remediation, and those incurred for investigation and monitoring prior to the discovery of groundwater contamination, are not costs "reasonably associated with remediating groundwater." *Sagendorf v. Selective Ins., Co.,* 293 N.J.Super. 81, 98, 679 A.2d 709 (App.Div. 1996). *See also, Strnad,* 292 N.J.Super. at 482, 679 A.2d 166 ("[C]osts of investigating the condition of groundwater in order to determine whether it required remediation would also be covered as damages.")

Therefore, as the insurers have failed to raise a genuine issue of material fact as to Purex's costs associated with the remediation of groundwater, the court will enter sum-

mary judgment in favor of Purex, finding that the owned property exclusion does not apply to these costs.

F. *Cross-Motions for Summary Judgment on the Issue of the "Voluntary Payments" Exclusion*

■ GEICO and Houston General have moved for summary judgment on the issue of whether the cleanup costs incurred by Purex were voluntarily assumed and thus subject to exclusion under the "voluntary payments" provision of the insurance policy at issue. AAU joins in the motion by GEICO and Houston General on the basis that its policies contain the same voluntary payments provision. Purex has also moved for summary judgment on this issue.

Houston Fire Policy UAP–1150 and the AAU policies at issue contain the following provision:

The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.

The insurers claim that Purex breached this provision by voluntarily accepting liability for the cleanup of the Millville site when it entered the ACO with the NJDEP in 1985. Purex argued that it signed the ACO because it had a legal obligation to comply with the ECRA and that compliance costs under that statute are mandatory, not voluntary. New Jersey law is clear that remediation costs incurred under ECRA are not voluntary payments. *See, e.g., Metex Corp. v. Federal Ins. Co.,* 290 N.J.Super. 95, 675 A.2d 220 (App. Div.1996) (finding obligation for ECRA costs even in absence of lawsuit, cleanup order or directive); *Crest–Foam Corp. v. Hartford Acc. and Indem. Co.,* No. L–1068–93 (N.J.Super.Law Div. Jan. 24, 1996) (finding policyholder had no choice but to enter into ACO, rendering voluntary payment exclusion inapplicable).

The insurers argue that the cases cited by Purex are inapposite because they involve situations in which the insured was the owner or operator of the site, and thus statutorily liable under ECRA or the statutory scheme at issue. ECRA requires that the owner or operator of an industrial establishment planning to sell or transfer operations submit a Negative Declaration or a Cleanup Plan to NJDEP for approval. The insurers argue that Purex was not liable under ECRA because it was not the owner or operator of the Millville site. Instead, the insurers claim, the City of Millville owned the site and Airwork operated it, and Purex voluntarily assumed the obligation and expense of the cleanup under a provision of ECRA which permits that any "other party to the transfer may assume responsibility." N.J. Stat. Ann. § 13:1K–9(c). The insurers allege that Purex voluntarily agreed to indemnify Airwork for cleanup costs so that the sale of Airwork to UNC would go through.

Purex responds that it was strictly liable as an "owner" of the site under ECRA because Airwork was its wholly-owned subsidiary. In support of this proposition, Purex cites *Cooper Development Co. v. First Nat'l Bank of Boston,* 762 F.Supp. 1145, 1145, 1154 (D.N.J.1991), in which this court determined that "NJDEP considers a controlling shareholder of a corporation to be an owner." The court went on to find that in NJDEP's view, the parent corporation in that case would be liable for ECRA compliance as an owner. *Id.* at 1155.

The insurers argue that *Cooper* has no bearing on this case because it was decided over five years after Purex entered the ACO. The *Cooper* case, however, did not make new law. It merely interpreted "ownership" under ECRA as it applied to a transaction which occurred (like the one here did) in 1985.

Even if the law on this issue prior to the *Cooper* decision was uncertain, Purex argues that it thought it was liable and signed the ACO based on that assumption. Purex's reasonable assumption was later vindicated by the *Cooper* decision.

■ The insurers argue, however, that Purex should be judicially estopped from arguing that it was statutorily liable because in another proceeding during the same time period, Purex argued to the NJDEP that it

did not have ECRA liability as a parent corporation.[3]

"Judicial estoppel" is an equitable doctrine which "seeks to prevent a litigant from asserting a position inconsistent with one that it has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing 'fast and loose with the courts.'" *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996) (citing *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir.1953)). In assessing judicial estoppel, the Third Circuit has utilized a two-part inquiry: 1) Is the party's present position inconsistent with a position formerly asserted? 2) If so, did the party assert either or both of the inconsistent positions in bad faith? *McNemar v. Disney Store, Inc.*, 91 F.3d 610 (3d Cir.1996) (citing *Ryan*, 81 F.3d at 361).

The court finds the insurers' judicial estoppel argument to be without merit. Even if Purex's prior position on parent liability is inconsistent with its current position, there is no evidence that Purex is attempting to "play fast and loose" with the court. In Patterson proceeding, during a time when there may have been some confusion over the statutory liability of a corporate shareholder as an owner under ECRA, Purex merely made an argument to the NJDEP that it should not be liable as a parent. There is no indication that that position, or the one asserted by Purex in this proceeding were made in bad faith. Purex's prior position was asserted to the NJDEP during an ongoing ECRA proceeding. No judicial forum relied upon any representation of Purex regarding the true nature of the facts or law, and although Purex denied liability as a parent entity in the prior matter, the NJDEP disregarded the denial and found liability anyway. Purex cannot now be held to that position through application of the doctrine of judicial estoppel.

As to the present matter, there is simply no evidence that the NJDEP would have allowed Purex to escape liability for remediation costs at the Millville site even if Purex—or its insurers—had challenged Purex's statutory liability under ECRA. The court thus concludes that as a matter of law, Purex did not voluntarily assume any obligations under ECRA and that the voluntary payments exclusion does not apply to the mandatory costs Purex has incurred under ECRA. The motion for summary judgment on behalf of the insurers will therefore be denied and the motion for partial summary judgment by Purex will be granted, finding the "voluntary payments" exclusion inapplicable to these circumstances as a matter of law.

G. *GEICO and Houston General's Motion for Summary Judgment Regarding Mitigation of Damages and Purex's Cross–Motion for Summary Judgment on the Reasonableness of Its Cleanup Plan*

GEICO and Houston General have moved for summary judgment seeking to dismiss Purex's counterclaim for any and all costs relating to the Millville site on the grounds that Purex has failed to mitigate its damages and only incur reasonable costs in resolution of the ECRA claims asserted against it. AAU has filed a joinder to this motion. Purex responds that it owes no duty of mitigation to the insurers with respect to minimizing the costs of cleanup. Also in response, Purex has filed a cross-motion for summary judgment as to the reasonableness of its

---

**3.** Plaintiff denied ECRA liability in the following context: In the 1980s, Purex and Armor–Dial, Inc. entered into an agreement whereby all of the outstanding capital stock of a subsidiary of Purex was transferred to Armor–Dial. This stock transfer resulted in a transfer of ownership of two facilities located in Patterson, New Jersey to Armor–Dial. Purex's subsidiary and Armor–Dial were then merged, forming the Dial Corporation. Purex claims that at the time of the transaction, it was advised that it was not subject to the ECRA. The NJDEP, however, filed a complaint against Purex seeking a declaration that Purex was strictly liable for all cleanup and removal costs and for all direct and indirect damages resulting from failure to implement a cleanup plan.

In 1987, Purex argued to the NJDEP in connection with the Patterson ECRA proceeding that it was not liable for ECRA for certain review and remediation obligations because it was never more than a shareholder in the company which owned the site.

cleanup plan.[4] For the reasons that follow, both motions will be denied.

Despite contention over almost every other point raised in these motions, the parties apparently agree that under New Jersey law, Purex may recover from the insurers only those costs that are reasonable and incurred in good faith under the circumstances. *Griggs v. Bertram*, 88 N.J. 347, 443 A.2d 163 (1982); *Fireman's Fund Ins. Co. v. Security Ins. Co.*, 72 N.J. 63, 367 A.2d 864 (1976). The insurers have not questioned the good faith of Purex in negotiating a cleanup plan with the NJDEP, and so the court will focus on the reasonableness of the costs incurred by Purex in connection with its cleanup plan.

The primary argument raised by the insurers is that the costs expended in the cleanup of the Millville site are unreasonable because the "pump and treat" system chosen by Purex in conjunction with their consultants and the NJDEP is an "excessively expensive, inappropriate and unreasonable choice." That system will cost approximately 30 to 50 million dollars and will take 15 to 30 years to complete the cleanup. The insurers argue that an alternative plan known as "air sparging" would have cost only 3 to 5 million dollars, and even if installed today, will only cost an additional 4 to 5 million dollars to complete the cleanup within 3 or 4 years. The insurers rely on the testimony of their expert Dr. Ram, who offered the opinion in his October 1995 report that 1) air sparging would have cost only 3 to 5 million dollars to clean up the site; 2) air sparging is an effective technology for site cleanup; 3) ERM inefficiently and substandardly performed an air sparging test and erroneously concluded that air sparging would not be effective; and 4) air sparging coupled with pump and treat would only cost an additional 4 to 5 million

dollars and only 3 to 4 years to clean up the site.

Purex claims that in late 1992, it submitted a cleanup plan to the NJDEP which proposed the use of a pump and treat system. Prior to installing the system, Purex conducted an "air sparging" test and submitted the results to NJDEP. Based on the results, Purex and ERM concluded that air sparging would not be a method by which the site could be cleaned up because the nature of the soils at the site would increase the risk of the spread of contamination.[5] The NJDEP subsequently approved the pump and treat system currently being used by Purex to remediate the Millville site.

As a threshold matter, Purex argues that the insurers are barred from questioning its choice of remediation methods because they failed to participate in the negotiations with the NJDEP or otherwise defend Purex in the ECRA proceeding. The insurers claim that they did not somehow waive their right to pay only those costs incurred by Purex that are reasonable, even if they breached their duty to defend. *Fireman's Fund*, 72 N.J. at 71, 367 A.2d 864 (holding that even if insurer wrongfully refuses coverage and defense to insured, insurer is liable only for reasonable settlement costs made in good faith). The court agrees with the insurers' position, and will not prevent it from arguing as to the reasonableness of the costs incurred by Purex.

Purex also argues that the insurers' challenge of Purex's choice of remediation system is an impermissible collateral attack on the state approval of Purex's cleanup plan. The court does not agree. NJDEP's conditional approval of Purex's proposed cleanup plan is not the type of final administrative judgment that may be insulated from collat-

---

**4.** The insurers question the timeliness of Purex's dispositive cross-motion under the scheduling orders in this case. Since the motion will be denied on the merits, the court will not address the question of whether the filing of the motion was permissible.

**5.** The insurers claim that Purex is estopped from arguing that air sparging is not an effective remediation technique because in 1992, Purex submitted a plan to the NJDEP in a different matter which included a statement that "Sparg-

ing is a proven remediation technique." It's clear from facts in this case, however, that effectiveness of air sparging may be dependent on the conditions of a particular site. It is therefore not inconsistent for Purex to support the air sparging technique for one site but not for another. Evidence of Purex's embrace of air sparging as a remediation technique elsewhere may be admissible to the extent it contradicts a position taken by Purex or its experts in this case.

eral attack. Purex itself argues elsewhere that the cleanup plan is still subject to modification and supervision by the NJDEP. Thus, the court sees no reason to prevent the insurers from questioning the reasonableness of the cleanup costs on this ground.

■ Getting to the heart of the matter, Purex argues that its plan is *per se* reasonable because the NJDEP approved it. The insurers suggest that the NJDEP approval may have been based on a faulty recommendation against the alternative method of air sparging from Purex's consultant, ERM. The insurers allege that the original air sparging test conducted by ERM was performed in a substandard manner. Relying on a case decided in this court, they argue that increased cleanup costs resulting from an environmental consultant's substandard work—in this case, performing the air sparging test and then recommending against air sparging to the NJDEP as a method of remediation—are not recoverable under a comprehensive general liability policy. *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co.*, 817 F.Supp. 1136 (D.N.J.1993), *aff'd*, 89 F.3d 976 (3d Cir.1996).

Purex responds that the NJDEP had an opportunity to review the test results and then rejected the idea of air sparging as a remediation method. As late as April 1996, after air sparging was again suggested for the Millville site, the NJDEP wrote in a letter to Purex that "the use of air sparging alone as a final remedial action is not acceptable." The NJDEP concluded, however, that air sparging may be appropriate "in conjunction with the existing groundwater remediation system."

The question of whether the costs incurred by Purex through the use of the pump and treat system are reasonable is not one that can be resolved on these motions for summary judgment. The parties have both presented factual evidence and expert opinions which should be resolved by a fact finder.

The conclusions in the report of the insurers' expert, Dr. Ram, have been challenged by the declaration of Purex's expert Stanley Feenstra. Mr. Feenstra's declaration also indicates that without the full date from the pilot air sparging test, no one could render a conclusive determination on the efficiency of air sparging at this time.

The insurers argue that the court should strike the Feenstra declaration because Mr. Feenstra was not timely designated as an expert witness. A January 16, 1997, Order entered by Magistrate Judge Kugler permits the designation of Mr. Feenstra as an expert. Judge Kugler thus necessarily enlarged the time strictures that would have otherwise precluded the declaration of a late-designated expert. However, having reviewed the declaration of Mr. Feenstra, notwithstanding the insurers' arguments as to its sufficiency,[6] the court is of the opinion that there is a genuine dispute of expert opinions over the air sparging issue which precludes summary judgment.

■ The insurers have also raised a second argument claiming that any sum ultimately recovered by Purex must be reduced by the substantial amounts received by Purex in previous litigation in California state court. This issue, too, is not appropriate for summary judgment at this time. On the record before the court, it is impossible to determine what amount of the earlier settlement, if any, should be credited against a recovery in this case. Neither Purex nor the insurers can identify the amount of the indemnity payments Purex received in the settlements from the California action which relate to the Millville site. Summary judgment will thus be denied.

---

6. The insurers argue that Mr. Feenstra's declaration is conclusory, and is not based on any specific facts pertaining to the air sparge test conducted at the site. The court finds, however, that the declaration is sufficient to raise a material factual issue as to this motion for summary judgment because it challenges the opinion submitted by the insurers expert, Dr. Ram. Mr. Feenstra takes the position that Dr. Ram's opinion is based on preliminary and incomplete data. Mr. Feenstra relies upon his experience with groundwater contamination and his familiarity with certain published articles which could, with the proper foundation, be admissible at trial. The insurers may certainly challenge the qualifications of Mr. Feenstra as an expert, but for the purposes of this motion, the court will accept his declaration.

**H.** *Liberty Mutual's Motion for Summary Judgment on the Grounds of a "No Assignment" Clause in Its Policy* [7]

Liberty Mutual maintains that it is not obligated to provide coverage to Purex because any policy allegedly written by Liberty Mutual was issued to Airwork, not Purex. In earlier summary judgment motion practice, Liberty Mutual challenged the existence of any policies that would cover the damages at issue here.

Purex has proceeded on the belief that Liberty Mutual sold Airwork Corporation a comprehensive general liability (CGL) policy for the period August 1, 1966 to August 1, 1967. The particular policy number for that policy is unknown. In addition, Liberty Mutual allegedly provided Airwork an umbrella excess liability policy number LE1–132–065841–066, covering the period October 1966—June 1968. Finally, Purex believes that Liberty Mutual sold Airwork a second CGL policy, number LG1–132–065841–027, for the period August 30, 1967 to August 30, 1968.

In denying Liberty Mutual's first summary judgment motion, this court found, in its Opinion dated February 3, 1995, that Purex produced sufficient evidence regarding both the existence and the terms of those policies that it may proceed to the jury. On a separate point, the court determined that Liberty Mutual failed to meet its burden, as summary judgment movant, to show the absence of genuine issues of material fact regarding whether there was an assignment of Airwork's rights under its insurance policies, valuable corporate assets, to Purex in connection with the purchase and sale of Airwork assets.

Despite this ruling, Liberty Mutual continues to claim that it did not issue policies to Airwork and to challenge the validity of the assignment from Airwork to Purex. Liberty Mutual assumes for the sake of this motion, however, that the alleged policies were issued. Further, it relies upon the opinion of Purex's expert Mr. Morrow in arguing that such policies would have contained "no as-

signment" provisions prohibiting the assignment of the policy without the consent of Liberty Mutual. The precise language of the clause is not available because the Liberty Mutual claims that because it never gave its consent, there was no valid assignment to Purex of the policy allegedly issued to Airwork.

Purex argues that a "no assignment" clause does not apply to a transfer of coverage effected through a merger. Several courts, including a district court in this circuit, have supported this proposition. *See, e.g., Total Waste Management Corp. v. Commercial Union Ins.,* 857 F.Supp. 140, 152 (D.N.H.1994); *Brunswick Corp. v. St. Paul Fire & Marine Ins. Co.,* 509 F.Supp. 750, 752–3 (E.D.Pa.1981); *Paxton & Vierling Steel Co., v. Great American Ins. Co.,* 497 F.Supp. 573 (D.Neb.1980). In *Brunswick,* the court held that under applicable state corporation law (whether it be that of Delaware, Maryland or Pennsylvania), the surviving corporation in a merger transaction succeeded to all the rights and benefits under a liability policy formerly belonging to the merged corporation, even though the policy had a clause prohibiting assignment without the insurer's consent.

The rationale for consent to assignment clauses is to protect insurers from unforeseen risks. *See generally,* 5A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 3425 (Buckley ed. 1970 & Supp.1992). Courts have refused to apply no assignment clauses to transfers occurring by operation of law because " 'such transfers do not entail any increase in the risk or hazard assumed by the insurer.' " *Brunswick,* 509 F.Supp. at 753 (quoting *Imperial Enterprises, Inc. v. Fireman's Fund Insurance Co.,* 535 F.2d 287, 291 (5th Cir.1976)); *Paxton & Vierling Steel Co.,* 497 F.Supp. at 581.

■ Purex claims that it acquired Airwork through a merger because it purchased all of the assets of Airwork in 1968. In a footnote, Purex further explains that "technically" Airwork's assets and liabilities were

**7.** To the extent Liberty Mutual reargues the points raised in its previous motion for summary judgment, which was denied by the court in its

Order dated February 3, 1995, the court declines to revisit those issues.

first transferred to a subsidiary wholly-owned by Purex and then subsequently absorbed into Purex itself. Liberty Mutual disputes that this corporate transaction was actually a merger. Without delving into whether the transfer of assets between Purex and Airwork was actually by way of merger, or merely the functional equivalent, the court finds that Liberty Mutual has failed to show as a matter of law that the assignment of the policy from Airwork to Purex was prohibited by the "no assignment" clause.

■ To the extent that the corporate successorship from Airwork to Purex is in question, that factual dispute precludes the entry of summary judgment. Assuming for the sake of argument, however, that Purex is the surviving corporation of a merger transaction, it is true as a matter of law that the insurance policy previously owned by Airwork would have transferred to Purex along with the other assets involved in the transaction, absent a specific provision in the policy to the contrary.

Summary judgment will thus be denied on this issue.

I. *AAU's Motions for Summary Judgment Regarding Specific Policy Coverage and Non–Cumulation of Policy Limits*

AAU moves for summary judgment on the grounds that two of the policies in question do not provide coverage to Purex for events at the Millville site. AAU further argues that even if more than one AAU policy is found to cover the Millville cleanup costs, Purex can only recover an amount equal to the greater or greatest policy limit of a single policy pursuant to an "anti-stacking" provision found in each of the AAU policies.

1. *Policy Number SP1–1195–LA*

■ AAU argues that Policy No. SP1–1195–LA ("the 1195 policy") did not insure Purex or its subsidiary Airwork for liability arising out of the Millville Site. To analyze this issue, a bit of additional background is required.

Policy No. SP1–1195–LA was issued by AAU to Pacific Airmotive Corporation, locat-ed in Burbank, California. The policy became effective on January 1, 1967. In September 1967, a wholly owned subsidiary of Purex, 9300 Rayo Corporation, acquired substantially all of the assets of Pacific Airmotive Corporation.

Also in September, 1967, Purex Corporation, Ltd. was added as a "named insured" on the SP1–1195–LA policy. The policy provides:

> The words 'Named Insured' shall include any wholly owned subsidiary company of the Named Insured and any other company coming under the Named Insured's control and of which it assumes active management.

The policy also states, however, that

> PUREX CORPORATION, LTD. is a Named Insured hereunder but only in respect to operations, property and exposures of PACIFIC AIRMOTIVE CORPORATION, INC.

(AAU ex. 3).

On June 14, 1968, Purex acquired Airwork, but did not add Airwork to the SP1–1195–LA policy as an insured. AAU claims that Airwork, even though it became a subsidiary of Purex, was not covered by the policy because Purex was insured only in respect to the operations of Pacific Airmotive in Burbank, California. AAU contends that it did not become responsible for coverage for the operations of Airwork at the Millville facility until Airwork was added as a named insured to a replacement policy, SP1–1211–LA, effective August 1, 1968.

According to the language of the policy itself, it appears that Airwork was not covered by SP1–1195–LA. The language which limits Purex's "named insured" status to operations of Pacific Airmotive indicates that Airwork was not covered by the policy merely because it was a subsidiary of Purex. Further, it is not contended that Airwork was a subsidiary of Pacific Airmotive at the time the 1195 policy was in effect, although Airwork and Pacific did later merge on April 14, 1969.

The question which remains for the court to resolve, however, is whether the parties held objectively reasonable expectations that

the 1195 policy provided coverage for Airwork, or for Purex with respect to operations of Airwork at the Millville facility. *Werner Indus., Inc. v. First State Ins. Co.,* 112 N.J. 30, 35, 548 A.2d 188 (1988).

AAU argues that by specifically adding Airwork to its replacement policy in August 1968, Purex demonstrates that it did not reasonably expect that Airwork was covered prior to that. Purex also did not attempt to change the language in the policy which limited Purex's coverage to operations of Pacific Airmotive.

Purex, however, argues that it had a practice of incorporating its newly-acquired companies into its existing insurance program and that it intended that Airwork would be covered as of June 14, 1968, the date of acquisition, under SP1–1195–LA. Purex claims that the 1195 policy was designated for its aviation-related operations, which until the Airwork acquisition included only Pacific Airmotive. In opposition to AAU's motion, Purex has presented letters from its insurance brokers which indicate that Purex, at least, thought that coverage for Pacific Airmotive's operations had been extended to Airwork effective June 14, 1968. Purex also claims to have canceled a Liberty Mutual policy based on the expectation that Airwork was covered under the 1195 policy.

As evidence that AAU, too, had an expectation that the 1195 policy covered Airwork, Purex presents AAU records which show that AAU provided coverage to Airwork under SP1–1195–LA for claims occurring in 1968.[8] (DSMF, ex. 69). Although AAU claims that the internal claim file record relied upon by Purex contained a secretarial or administrative error, the court concludes that based on the evidence presented, a reasonable jury could find that the parties had reasonable expectations that Airwork was covered under Policy SP1 –1195–LA as of June 14, 1968. Summary judgment will therefore be denied as to this issue.

8. One of the events for which coverage was provided appears to have occurred in February 1968, prior to the time Airwork was even acquired by Purex. The other, however, occurred

2. *Policy No. AP1–825/Binder No. B1–122859*

█ AAU asks the court to find that Policy No. AP1–825 never issued to Purex and is thus unavailable as a source of coverage for the Millville site. AAU explains that during the summer of 1971, as Policy No. SP1–1211–LA was due to expire, Purex's insurance brokers began to shop for replacement coverage. AAU contends that as the August 1, 1971 expiration date drew near, it agreed, as a courtesy to Purex, to extend Policy No. SP1–1211–LA for one month to September 1, 1971.

Purex does not disagree that Policy No. AP1–825 never issued. That policy contained a pollution exclusion, and Purex was seeking a policy without such a restriction. Purex claims, however, that AAU issued Binder No. B1–122859, which provided $1,000,000 of coverage per occurrence for the one-month period from August 1, 1971, to September 1, 1971, in exchange for a separate premium. Purex argues that this binder constitutes a separate policy under which it may seek coverage for the Millville cleanup costs.

In support of its motion for summary judgment, AAU provides the court with a letter from Purex's broker, Jack Schweinfurth, dated August 30, 1971. The letter to AAU Vice President Kent Robinson, was captioned "Renewal of SP1–1211–LA." Further, in the text of the letter, Mr. Schweinfurth wrote:

Since your binder [B1–122859] technically was an extension of the captioned policy [SP1–1211–LA] for a 30 day period, it would be appreciated if you would acknowledge our understanding by accepting same with your signature on the attached copy of this letter so that we might confirm the September 1st, 1971 date to our client this afternoon.

(AAU ex. 8).

AAU claims that this letter clarifies that the parties intended to extend a previous policy, and not to enter into a separate policy. Purex, however, presents evidence which

in July 1968, which falls directly within the period for which Purex claims that Airwork was covered.

puts the intent of the parties into question. Mr. Schweinfurth testified at his deposition that he understood that the binder was a separate policy that incorporated the terms of Policy No. SP1–1211–LA, not an extension of that policy. DSMF ¶ 267. Further, Purex points to a 1972 memorandum from AAU's Vice President which states that "the period 8/1/71 –9/1/71 was covered by the captioned binder rather than an endorsed extension to Pol. # SP1–1211–LA." DSMF ¶ 268.

It is clear that this evidence creates a genuine issue of material fact as to whether the period of August 1 through September 1, 1971, was covered by Policy No. SP1–1211–LA, or by the separately issued binder B1–122859. In fact, AAU admits in its reply brief that "Purex's contentions, if meritorious raise issues of fact which need to be resolved by the trier of fact at the time of trial." (AAU Reply Br. at 15). AAU's motion for summary judgment on this issue will thus be denied.

### 3. *Non-Cumulation of AAU Policies*

■ Finally, AAU seeks summary judgment by way of a declaration that as a matter of law, under the terms of the AAU polices, Purex is "limited to recovery under only one policy" (AAU Br. at 20). Stated differently, AAU argues that its total liability to Purex is restricted to the limits of one policy, regardless of the number of AAU policies that are found to cover the costs incurred by Purex.

AAU points an "anti-stacking" provision contained in policies SP1–1195 and SP1–1211, which provides as follows:

> If collectible insurance under any other policy issued through Associate Aviation Underwriters is available to the Insured covering a loss also covered hereunder, the Insurer's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy.

AAU claims that this policy language clearly provides that the per occurrence limits (the maximum amount the company will be liable for any one occurrence) of the policies are not cumulative. From this, AAU concludes that its total limit of liability does not exceed the greater policy limit under any one policy.

The court reaches a different conclusion upon reading the relevant provision. The language does not, as AAU would suggest, provide an absolute cap on all recovery by Purex. Instead, the provision requires only that for any one particular loss covered by more than one AAU policy, Purex may not recover more than the greatest policy limit for that particular loss.

This proposition does not lead the court to conclude, however, that Purex would be prohibited from recovering on more than one AAU policy if it can show, for example, that more than one loss occurred, or that the loss it suffered was attributable to more than one occurrence covered by an AAU policy. In either case, AAU may be liable to Purex for an amount greater than the policy limit under any one policy.

Purex claims that unresolved factual issues exist in this case as to the number of occurrences at issue, the dates and location of the occurrences, and the amount of risk assumed by the insurers. While these fact issues do not themselves preclude summary judgment as to the interpretation of a contract provision, their resolution will be helpful in applying the terms of the insurance policies at a later date.

As to AAU's present motion, however, the court finds that AAU is not entitled to a declaration that its "total limit of liability does not exceed the greater policy limit under any one policy." (AAU Br. at 17). This is because the court reads the relevant policy provision as not ruling out situations whereby Purex could recover more than the amount of a single policy limit from AAU. Therefore, AAU's motion for summary judgment will be denied.

### J. *Insurers' Motion for Summary Judgment as to Defense Costs*

■ AAU, joined by Liberty Mutual, GEICO and Houston General, moves for summary judgment on the issue of whether Purex can receive defense costs incurred with respect to the Millville site from these insurers. In its counterclaim, Purex has

asked for a declaration that the insurers in this case have a duty to defend Purex with respect to Millville. The insurers argue that Purex sought the same declaration sought in an earlier California case to which these insurers were not parties, and now must be prohibited from relitigating that issue.

In the California litigation, the court found that insurers First State and Transcontinental had an obligation to defend Purex with regard to the Millville site. Purex claims that it received $1,426,788.86 from those two insurers for defense costs in connection with sites including Millville. Purex now argues that it seeks only unreimbursed defense costs, some of which have been incurred since the conclusion of the California litigation in March 1992.

AAU argues that because the issue of duty to defend has already been determined by the California court, issues of claim preclusion prevent Purex from relitigating that issue. AAU has failed to establish as a matter of law, however, that the prerequisites for claim preclusion have been met here. The so-called "issue of duty to defend" is a broad one that has continuing implications in a complex case such as this. Because the parties to the California litigation were different than the ones in this litigation, and the defense costs at issue here have arisen after the conclusion of the previous litigation, the court cannot say that Purex is precluded from seeking defense costs from the insurers in this case simply because it obtained a previous ruling that other insurers bore some responsibility for defense costs incurred at the time of that suit.

AAU argues in the alternative that the amount of the prior judgment with respect to defense costs must be used in any allocation scheme with regard to defense costs. The New Jersey Supreme Court in *Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974 (1994), determined that in cases of continuous loss, there must be a proration of the respective obligations of insurance carriers using a formula based upon elements of policy limits and time on the risk. *Id.* at 475–8, 650 A.2d 974. Following the suggestion of the *Owens–Illinois* court, this court suggests that the parties give consideration to the appointment of a special master to handle the allocation phase of the litigation in this case.

In connection with the allocation of defense costs in this litigation, the court will certainly prevent a "double recovery" by Purex for defense costs already received. It is also probable that an allocation scheme will take into account any amounts that could have been recovered from Transcontinental and First State but were not recovered due to a choice by Purex.

At this point in time, however, the court cannot rule on a motion for summary judgment that the insurers in this case will owe no money to Purex from their contractual duties to defend, if Purex proves that such duties exist. There is also insufficient information on the record before the court to make the determinations of allocation which the insurers currently seek.

Thus, summary judgment on the issue of defense costs will be denied without prejudice to revisiting the issue at a later stage in the litigation.

*Conclusion*

For the foregoing reasons each of the pending motions will be denied, with the exception of Purex's motion for summary judgment on the issue of whether ECRA compliance costs constitute damages under the insurance policies; Purex's motion for summary judgment as to the application of the "owned property" exclusion; and Purex's motion for summary judgment as to the application of the "voluntary payments" exclusion. Those three motions will be granted in favor of Purex.

An appropriate order follows.